MAIN, Judge.
Calvin McMillan was convicted of capital murder for the intentional murder of James Bryan Martin by shooting him in the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and for the intentional murder of James Bryan Martin by shooting him inside a vehicle, see § 13A-5^0(a)(17), Ala.Code 1975. The trial court sentenced McMillan to death following the jury’s 8-4 advisory verdict of life imprisonment without parole. The trial court overrode the jury’s recommendation, finding that the aggravating circumstance that the murder was committed during a robbery outweighed the statutory mitigating circumstances concerning McMillan’s age at the time of the offense and his lack of criminal history, as well as the nonstatutory mitigating circumstances.
The State’s evidence tended to show that on August 29, 2007, Calvin McMillan and Rondarrell Williams drove to the Wal- *191 Mart discount retail store in Millbrook in a white Nissan Sentra automobile belonging to Williams’s girlfriend, in order for McMillan “to get him a ride.” (R. 1046.) Williams testified that he knew that McMillan had a gun. The men parked the vehicle by a truck on the outskirts of the parking lot and Williams went into the Wal-Mart store. He purchased some speakers and returned to the vehicle, where McMillan, despite opening and closing the vehicle’s front passenger door several times, had remained. After a few minutes, Williams again got out of the vehicle and returned to the store.[1]
While Williams was in the store, McMillan got out of the vehicle and began walking around the parking lot, eventually standing by the entrance to the store. He subsequently returned to the vehicle and sat in the front passenger seat with the door open. He then got out of the vehicle quickly, wearing a different shirt than he was wearing when he and Williams had entered the parking lot, and approached a man later identified as the victim.
That same evening, the victim, James Bryan Martin, had driven to the Wal-Mart store in Millbrook following a Montgomery Biscuits minor-league baseball game. He had parked his Ford F-100 pickup truck in the parking lot a few rows from the vehicle driven by Williams and had entered the store. Inside, he had purchased diapers, a Vault brand beverage, and Reese’s brand candy. After checking out, he put his bags in his truck.
The victim was then approached by a man later identified as McMillan. Video surveillance of the parking lot of the Wal-Mart store, which was admitted into evidence as a DVD, shows that Martin walked several feet toward McMillan, and then turned and walked back to his truck. The surveillance video also shows that Martin got into his truck and that a few seconds later the brake lights on the truck came on. The video further shows that McMillan also walked toward Martin’s truck, hesitated when another vehicle drove down the aisle, and then, when that vehicle passed, McMillan went to the driver’s side door of the truck. The video demonstrates that McMillan appeared to shoot Martin and then pull him out of his truck. Martin collapsed on the concrete and McMillan shot him two more times. McMillan got into the truck and started to drive away. He then placed the truck into park, got out of the truck, and appears to have shot Martin again. At that point, McMillan quickly got back into the truck and sped out of the parking lot. Several witnesses who were present in the parking lot or who were in the entrance of the Wal-Mart store approached the victim and called for help.
As the shooting began, the video surveillance shows that Williams walked from the Wal-Mart, hesitated, took a few steps backward, and then walked to his girlfriend’s vehicle. Williams placed his bags in the trunk of the vehicle and drove away.
A number of BOLO[2] alerts were issued pursuant to descriptions given by witnesses, and they were reissued after the video-surveillance tapes were reviewed. An officer, Corporal Manora of the Montgomery Police Department, who was patrolling the next morning at approximately *192 9:30 a.m., saw a truck matching the description given in the BOLO and began to follow it. The officer called for backup. The truck pulled into an apartment complex and stopped, and the driver jumped out of the truck and ran away. The patrolling officer and another officer who had arrived at the scene chased the driver but were unable to catch him. Neither officer could identify the driver, because they saw him only from behind.
A large number of law-enforcement personnel, including a helicopter crew, arrived at the scene, and a crowd of onlookers gathered. Calvin McMillan, who was among the crowd, later stated that he informed an officer that he had some belongings in the truck and asked if he could retrieve them. (R. 1240-41.)
The truck was taken into custody by the Millbrook Police Department and driven to the Alabama Bureau of Investigation where it was processed for fingerprints. Thirty-three of the fingerprints found in the truck matched McMillan’s.
The truck was then picked up and inventoried by officers from the Millbrook Police Department. The truck contained a bag with McMillan’s clothing, as well as a DVD movie that had been rented by Martin. Another bag in the truck contained McMillan’s clothing. Officers also found the 9mm High Point brand automatic pistol used to shoot Martin hidden under some clothing in a compartment behind the front seat. A karaoke machine, televisions, and an iron were also found in the truck. McMillan’s wallet with his Alabama driver’s license and McMillan’s Hyundai Motor Manufacturing contractor’s identification card were also located in the truck. Officers found documents pertaining to the ownership of the truck, including one from MAX Federal Credit Union, which contains Martin’s signature as the borrower, and McMillan had signed on the line purporting to be a co-borrower for the truck.
Two disposable cameras were found in the truck. The film from those cameras was subsequently developed one of the pictures was a photograph of McMillan pointing a pistol resembling the murder weapon at the camera,[3] a photograph of a 9mm High Point pistol positioned on a pile of money, another photograph of the pistol placed on a pillow or bedding, and two photographs of McMillan making hand gestures at the camera. There was also a photograph of a closet containing a striped shirt and a camouflage hat that matched the description of the shirt and hat worn by the man who had shot Martin.[4] Among the clothing found in the truck was a black shirt with a neon skull that resembled the shirt worn by the man in Williams’s girlfriend’s vehicle the first time he had gotten out of the vehicle.[5] The officers also found a pair of black Dickie brand shorts like those worn by the man who shot Martin; in the pocket of those shorts was a 9mm shell casing and a Reese’s brand candy wrapper.
McMillan gave a statement indicating that he had been given a ride to Montgomery in the truck belonging to Martin by a man named Melvin Ingram Browning and *193 that Browning had driven away with McMillan’s possessions in the truck. The State introduced evidence at trial indicating that McMillan had a Social Security card for a Melvin Eugene Browning in his wallet. (R. 1240.) Melvin Eugene Browning testified that his wallet had been lost years before this incident and that he was in the Lee County jail at the time of the offense. The State presented evidence to substantiate Browning’s whereabouts at the time of the offense.
At trial, McMillan denied that he was the man who committed the offense and challenged the strength and credibility of the State’s evidence.
I.
McMillan argues that the trial court erred in admitting his statement, which he says was unconstitutionally obtained after he had invoked his right to counsel. McMillan alleges that police officers improperly reinitiated the interrogation after he had requested counsel when the officer remained silent for several minutes and then asked McMillan to initial a waiver-of-rights form concerning his invocation of right to counsel. Thus, McMillan argues that although he unambiguously invoked his right to counsel, the police improperly subjected him to further interrogation before securing counsel. McMillan further asserts that because the State offered no proof that his subsequent statement was not made in response to police questioning, which was the State’s burden, the statement was inadmissible. He argues that this erroneous admission caused his defense extreme prejudice and therefore constituted reversible error.
The State presented testimony at trial that McMillan gave a statement to an investigator with the Millbrook Police Department, Investigator Kirk Pelham, and another officer.[6]- Investigator Pelham testified that he interviewed McMillan at the Millbrook Police Department and that the statement was recorded. After being informed of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), McMillan indicated that he wanted an attorney. Investigator Pelham testified that he then “stopped, ... gathered [his] stuff, and began to leave the room.” (R. 1228.) In response to his actions, Investigator Pelham testified that McMillan stated, “ ‘What, I can’t answer questions?’ ” (R. 1228.) To which, investigator Pelham confirmed that he could not. Thereafter, McMillan stated that he wished to continue with the interview, and Investigator Pelham asked if he understood all of his rights and whether he had any questions. McMillan affirmed that he understood his rights, and the interview began.
During the pretrial suppression hearing, Investigator Pelham testified that neither he nor anyone in his presence threatened or coerced McMillan in order to force him to give a statement, nor did anyone make any promises or give any hopes of reward in order to obtain his statement. He further testified that McMillan did not appear to be under the influence of any substance and affirmed that he could read and write. He testified that McMillan had been informed of his constitutional rights before he indicated that he wished to have an attorney present. McMillan had been initialing each line of the Miranda form, indicating that he waived his rights; however, when he stated that he wanted an *194 attorney, Investigator Pelham testified that he asked him to write “no, with attorney present” next to the statement of that right on the form. (R. 190.) He testified that McMillan did not make that notation, but instead asked, “ “What, I can’t talk? I’ll answer questions.’ ” (R. 194.) Investigator Pelham further testified that he responded affirmatively and McMillan then stated, “ ‘I’ll talk.’ ” (R. 195.) McMillan was again informed of his rights and initialed the waiver form.
Investigator Pelham testified that he left the interrogation room before beginning the interview in order to telephone the prosecutor, stating that “I wanted to call you [the prosecutor] and make sure that I was doing what I needed to do on my end.” (R. 196.)
He then returned to the interrogation room and asked McMillan if he understood his rights and whether he had any questions. McMillan responded that he understood his rights, that he had no questions, and that he wished to answer questions. He was then interviewed until he indicated that he did not wish to answer questions anymore.
At both the pretrial hearing and at trial, the State introduced a recording of the interview, including the initial invocation by McMillan of his right to counsel and his subsequent waiver.
“ ‘In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held:
“ ‘ “[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.”
“ ‘451 U.S. at 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (footnote omitted). The purpose of this rule is to protect an accused in police custody from “ ‘badgering]’ or ‘overreaching’ — explicit or subtle, deliberate or unintentional— [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel’s assistance.” Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
“ ‘ “This ‘rigid’ prophylactic rule, Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra, 451 U.S. [477], at 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 [ (1981) ] (whether accused ‘expressed his desire’ for, or ‘clearly asserted’ his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S. [436], at 444-445, 86 S.Ct. 1602, 16 L.Ed.2d 694 [ (1966) ] (whether accused ‘indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking1). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had in *195 voked. Edwards v. Arizona, supra, [451 U.S.,] at 485, 486, n. 9.”
“ ‘Smith, v. Illinois, 469 U.S. at 95, 105 S.Ct. 490, 83 L.Ed.2d 488.’ ”
Phillips v. State, 65 So.3d 971, 1020 (Ala.Crim.App.2010).
“The Supreme Court in Edwards [v. Arizona, 451 U.S. 477 (1981),] made it clear that a suspect may waive his previously asserted right to counsel and respond to interrogation. However, when an accused has invoked his right to counsel, a valid waiver of that right cannot be established by showing only that the accused responded to police-initiated interrogation after again being advised of his Miranda rights.”
Ex parte Williams, 31 So.3d 670, 676 (Ala.2009).
“ ‘[A]n accused ... having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges or conversations with the police.’ Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981) (emphasis added). See also Payne v. State, 424 So.2d 722 (Ala.Crim.App.1982). As has been stated in this jurisdiction, ‘[a]ny person arrested who asserts his right to counsel may later change his mind and voluntarily submit to questioning.’ Morrison v. State, 398 So.2d 730, 743 (Ala.Crim.App.1979), rev. on other grounds, 398 So.2d 751 (Ala.1981) (citations omitted); see also Sales v. State, 432 So.2d 560 (Ala.Crim.App.1983).”
Seawright v. State, 479 So.2d 1362, 1366 (Ala.Crim.App.1985). See also Davenport v. State, 968 So.2d 27, 30-31 (Ala.Crim.App.2005).
McMillan argues on appeal that the police continued interrogating him after he had invoked his right to counsel because Investigator Pelham asked him to initial the waiver form, indicating that he was not waiving his right to counsel. However, this action by the police did not constitute interrogation.
“ ‘[S]inee the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.’ Rhode Island v. Innis, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted).” Snowden v. State, 968 So.2d 1004, 1013 (Ala.Crim.App.2006). “Since ‘the Sixth Amendment is not violated whenever — by luck or happenstance — the State obtains incriminating statements from the accused after the right to counsel has attached,’ [Maine v. Moulton,] 474 U.S. [159], at 176, 106 S.Ct. [477], at 487 [ (1985) ], citing United States v. Henry, [447 U.S. 264], at 276, 100 S.Ct. [2183] at 2189 [ (1980) ] (Powell, J., concurring),” a defendant must demonstrate that the police took some action “that was designed deliberately to elicit incriminating remarks.” Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).
Here, Investigator Pelham’s conduct, asking McMillan to mark or make a notation on the waiver form to indicate that he was invoking his right to counsel, was not an act that was “designed deliberately to elicit incriminating remarks.” Kuhlmann v. Wilson, 477 U.S. at 459. Rather, this request by Investigator Pelham was “a purely administrative ‘housekeeping’ ”[7] act that is necessary for police to maintain proper records.
*196 Moreover, McMillan initiated the interview by asking, “You mean with a lawyer present you can’t ask me no questions? ... I’m saying I’ll answer some questions.” (Court’s Exhibit PPP; State’s Exhibit 118.) On the recording of McMillan’s statement, he then stated that he thought that Investigator Pelham was planning on getting him a lawyer. Following this assertion by McMillan, Investigator Pelham again informed McMillan of his constitutional rights, and McMillan acknowledged that he understood them. McMillan then stated that he wished to waive those rights and answer questions.
In Crumpton v. State, 677 So.2d 814, 817 (Ala.Crim.App.1995), an officer testified that he ceased questioning Crumpton, the defendant, when he invoked his right to counsel, but “that when he got up to leave [Crumpton] said to him that he did not want to die in the electric chair.” This Court held that Crumpton initiated the questioning by making the comment.
“In Oregon v.. Bradshaw, [462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1981) ] the United States Supreme Court had occasion to define ‘initiate’ as that term was used in Edwards v. Arizona. The Court stated:
“ ‘While we doubt that it would be desirable to build a superstructure of legal refinements around the word “initiate” in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to “initiate” any inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation....
“ ‘... [T]he respondent’s question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation .... ’
“462 U.S. at 1045-46, 103 S.Ct. at 2835, 77 L.Ed.2d at 412.
“This court in Wilson v. State, 571 So.2d 1237 (Ala.Cr.App.1989), rev’d on other grounds, 571 So.2d 1251 (Ala.), on remand, 571 So.2d 1266 (Ala.Cr.App.1990), applied both of the above United States Supreme Court’s holdings and stated:
“ ‘Under the totality of the circum-stancés in the present case, the evidence indicates that the appellant knowingly and intelligently waived his right to counsel by initiating conversation with Investigator Kidd; stating that he wished to speak without his attorney present; and initially stating, “Mr. Kidd, I ain’t done nothing.” Such a statement indicates a desire “for a generalized discussion about the investigation.” ’
“571 So.2d at 1247.”
Crumpton v. State, 677 So.2d at 816-17.
In the present case, McMillan invoked his right to counsel, but he then waived this right in an ambiguous manner. Investigator Pelham properly reinstructed McMillan of his rights as a result of Pel-ham’s or McMillan’s apparent lack of understanding. He then left the room and later returned and again informed McMillan of his rights. McMillan clearly indicated that he understood his rights, and that he wished to waive them, and he marked *197 the waiver-of-rights form, indicating his decision to waive his rights.
“ ‘If the accused manifests a lack of understanding as to the meaning of these rights, or how they directly affect him, the interrogators must make special efforts to secure his understanding. Repetition of the warnings, and the giving of hypothetical factual examples may become necessary. These precautions will help to ensure that any waiver subsequently made is “knowing and intelligent.” ’
“19 Am.Jur., Proof of Facts § 11 at 21 (1967). See also id. § 8 at 18. It was the obligation of the interrogator not to ignore or gloss over the possible implications of McDevitt’s response. He should have made an inquiry to clarify the ambiguity and to specifically advise McDev-itt, at that time, that appointed counsel would be provided, if desired, before the questioning proceeded. E.g., People v. Turnage, 45 Cal.App.3d 201, 211-12, 119 Cal.Rptr. 237, 243-44 (1975) (wherein the court noted that, where confronted with a patent ambiguity with respect to the suspect’s understanding of his constitutional rights, when the suspect stated that he could not afford an attorney, after having waived his rights, the officer was justified in asking clarifying questions).
“In so holding, we caution that our ruling is not to be interpreted too broadly. We are not indicating that the formal Miranda requirements should be expanded. It would be unreasonable as well as impractical to impose the requirement upon officers that they enumerate to a suspect every conceivable consequence of waiver of the warnings or that they place a legal interpretation on a suspect’s actions or statements. ‘Although a suspect must be apprised of his or her rights, providing a general legal education is not the business of the police or the courts.’ People v. Williams, 62 N.Y.2d 285, 288, 476 N.Y.S.2d 788, 790, 465 N.E.2d 327, 329 (1984). We also do not mean to require the interrogator to detect the misunderstanding of clear warnings without some indication of misunderstanding. In other words, if no confusion or misunderstanding is manifested, the interrogator is not required to go beyond a reading of the Miranda warnings. What we do require, however, is that the Miranda warnings be clearly explained and if, after the suspect has indicated an understanding of those rights, he subsequently acts in such a manner as to reasonably alert the interrogating officer that the warnings may have been misunderstood, the officer must insure that the suspect fully and correctly understands his Miranda rights. This is ‘to insure that what was proclaimed in the Constitution ha[s] not become but a “form of words,”’ 384 U.S. at 444, 86 S.Ct. at 1612; in other words, the ritualistic reading of the Miranda warnings will not always, without exception, sufficiently apprise an accused of his rights. The Miranda warnings are not to be treated as ‘a mere textual formality to be recited on the way to eliciting a confession.’ United States v. Rondon, 614 F.Supp. 667, 670 (S.D.N.Y.1985).”
State v. McDevitt, 484 So.2d 543, 549-50 (Ala.Crim.App.1985). Cf. Ex parte Woods, 789 So.2d 941, 944-46 (Ala.2001) (officers did not improperly continue to interrogate Woods after he had checked the “ ‘no’ ” box on the waiver-of-rights form by asking whether he had checked the correct box because his invocation of his right to counsel was ambiguous).
Following McMillan’s initial invocation of his right to counsel, he indicated that he wished to waive that right; however this waiver was ambiguous. Investigator Pel- *198 ham refrained from questioning him at that time and again informed him of his constitutional rights on two occasions. McMillan then indicated an understanding of his rights and a desire to waive them. Because Investigator Pelham did not interrogate McMillan until he had indicated that he understood his rights and chose to waive them, there was no constitutional violation of his right to counsel and his statement was properly admitted.
II.
McMillan argues that the State illegally exercised its peremptory strikes in a racially discriminatory manner. He contends that the trial court improperly determined that there was no prima facie showing of racial discrimination. On appeal, he raises other specific allegations that were not raised at trial.
A.
McMillan alleges that the prosecutor improperly and unconstitutionally struck potential jurors based on race. He therefore contends that the trial court improperly failed to find a prima facie case of discrimination.
The transcript indicates that the court’s list of potential jurors before voir dire contained 140 names.[8] (R. 305.) A lengthy voir dire was conducted, whereby the trial court initially allowed potential jurors to come forward with reasons that serving on the jury would cause him or her hardship. Thirty-one potential jurors were excused for hardship. (R. 375-76.) The remaining veniremembers completed juror questionnaires that had been prepared by both parties. They were then questioned by the trial court concerning any relationships to the parties, attorneys, witnesses, or their families. The trial court also asked general questions of the potential jurors concerning any connections they had with law-enforcement personnel or agencies, whether they had been victims of crime, and whether they had served on a jury or a grand jury in the past.
Thereafter, both the prosecutor and defense counsel thoroughly questioned the veniremembers as to concerns that might have affected their jury service on this case. The trial court finally asked questions of potential jurors individually who had indicated that they had been exposed to pretrial publicity or had strong feelings concerning the automatic imposition of the death penalty or of the sentence of life imprisonment without parole. The court also followed up on statements that potential jurors had made in answering earlier questions that had indicated the possibility of bias. Subsequently, the prosecutor moved to strike three potential jurors for cause, and the trial court granted these strikes. Defense counsel moved to strike seven potential jurors for cause and six of these were granted. In all, the trial court excused 13 potential jurors for cause.
The jury panel was then composed of 52 members from which the parties each struck 19 potential jurors. Defense counsel made a motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), concerning three of the four black veniremembers who were struck by the prosecutor.[9]
The following transpired concerning this motion:
*199 “[Defense counsel]: ... We make a Batson challenge as to three black jurors that were stricken by the State.... [J]uror number 114, just in reviewing my notes I have the only thing he responded to was when you asked where everybody works and I think he said McDonald’s [fast-food restaurant]. I don’t think there was any other response.
“[Prosecutor]: It’s a female.
“[Defense counsel]: I’m sorry, she. She worked at McDonald’s. I don’t have any other response. The State may have some other responses on which they’re basing their strike on, but that’s about all I had.
“[Prosecutor]: What are the others?
“[Defense counsel]: [Juror 81].[10]
“[Prosecutor]: [Juror 79], okay. And?
“[Defense counsel]: [Juror 176].
“[District Attorney]: Okay.
“[Prosecutor]: Is that it?
“[Defense counsel]: Those are the three black jurors that were stricken, yes, sir. And the basis of that is just in looking at my notes, reflecting on my notes, I don’t see anything that’s necessarily detrimental to the State as to why they would be stricken.
“THE COURT: Well, did you compare these jurors to other jurors that the State did not strike for similar traits to establish the first prong of your Bat-son challenge?
“[Defense counsel]: Judge, I would simply say that, for example, [Juror 79] voted or said that she would likely vote for the death penalty if he was convicted.
“[Prosecutor]: May I respond to that assertion. Your Honor?
“THE COURT: Okay.
“[Prosecutor]: During the life and death qualification of the jury we do not show that [Juror 79] said anything. And her questionnaire says T can’t make that call on someone’s life.’ So to the extent that they’re asserting that she made favorable comments to the death penalty on their first prong of the challenge, we would respectfully disagree with that assertion.
“[District attorney]: Plus in asking she said in question 21 it says ‘what do you think about the death penalty?’ She said nothing. So we had her listed as a weak death penalty person or soft on the death penalty and basically tried to strike all similarly situated people.
“[Prosecutor]: I mean, if they can show another juror that had a similar answer that was white, then I mean, starting out under [E]x parte Branch, my concern is there were eight African-American jurors when we started this process. The State struck four, of which the defense takes issue with three. However, the defense struck one, number 202, ..., leaving three African-Americans on the venire, none of which is the alternate, so they are actual jurors who will serve in this case. I think if you’re looking at it from just a cold calculated numbers game like the defense is approaching it, it’s not there. And therefore under Branch we would just ask that we not be required to defend what wasn’t even an objectable [sic] striking of the jury.
“THE COURT: We’ve got three African-Americans remaining on the jury?
*200 “[District Attorney]: Who are not alternates.
“THE COURT: Out of the 12?
“[Prosecutor]: Who are not alternates, yes, sir.
“THE COURT: I’m not good at math, but that’s 25 percent, isn’t it?
[[Image here]]
“THE COURT: And the makeup of the black population in this county is what, somewhere close to 16?
“[District Attorney]: Yes, sir. And plus the makeup of the entire panel, it was even less if you consider the entire panel that we struck from.
“THE COURT: All right. Number one, I don’t think the defense can show a prima facie case to even get to the next prong with regard to the Batson challenge; unless you can show me something else, that there’s somebody that wasn’t struck, that was white that the State did not strike, that had the same characteristics as these black people that'were struck.
“[Defense counsel]: Judge, we don’t have that. We simply were requesting that the State put on the record why they struck those particular jurors.
“THE COURT: All right. Well, I don’t think the State is — let me rephrase that. I don’t think the defense has set forth a prima facie case to give rise to the State being required to state then-basis for strikes, but I will note that the State did submit to the defense, as well as to the Court, information that they had on potential jurors. In looking at that information I see that [Juror 114] was previously convicted of assault third in Wetumpka in April of 2009. That’s information that the defense was provided as well.
“And I don’t — anyway, based on the— as the Court said, based on the Court’s understanding of Batson, although I realize that a lot of times courts don’t follow it, the Batson, Branch and progeny, the Court finds the defense has failed to set forth a prima facie case that would require the State to proceed with stating their reasons for strikes, therefore the Batson motion is denied. I may be running a risk, but if I am, so be it.”
(R. 645-50.)
The record reveals that McMillan failed to make a prima facie showing of racial discrimination. The only basis for his motion was that the State struck the three cited black potential jurors and that defense counsel did not believe that they had said anything detrimental to the State. When the trial court asked defense counsel for more specifics or facts supporting an inference of discriminatory intent, he was unable to provide any.
In Johnson v. State, 823 So.2d 1 (Ala.Crim.App.), cert. denied, Ex parte Johnson, 823 So.2d 57 (Ala.2001), cert. denied, Johnson v. Alabama, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002), this Court held that Johnson failed to make a prima facie showing of discrimination because he offered no evidence other than statistics and defense counsel’s opinion that no valid reasons for striking these jurors, had been revealed during voir dire questioning. This Court stated:
“ ‘In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant *201 facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch, 526 So.2d 609, 622-623 (Ala.1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor’s questions during voir dire, including desultory voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike African-Americans; and the use of peremptory challenges to dismiss all or most black jurors.’
“Madison v. State, 718 So.2d 90, 101-102 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998).
“Johnson offered no evidence, other than statistics and his counsel’s opinion that no valid reasons for striking these jurors were revealed during voir dire, to show that the prosecutor exercised his strikes in a discriminatory manner. See, e.g., Duncan v. State, 827 So.2d 838, 855-57 (Ala.Crim.App.1999), aff'd, 827 So.2d 861 (Ala.2001) (Batson motion in which counsel asserted only statistics and his opinion that nothing was revealed during voir dire to provide a legitimate reason for the strikes held insufficient to satisfy defendant’s burden of proving a prima facie case). Johnson did not offer evidence, nor even allege, that the struck veniremembers shared only the characteristic of race, that there was a lack of meaningful voir dire directed at black veniremembers, that black and white veniremembers were treated differently, or that the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers. Johnson noted only that the State used 6 (less than half of its 14) strikes to remove 6 of the 9 African-Americans from the venire, and that, in his counsel’s opinion, no articulable reason for the strikes was revealed during voir dire. We do not find the statistics or defense counsel’s assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination. ‘A circuit court’s ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous.’ Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996). ‘“[A] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” ’ Davis v. State 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989), quoting, in turn, Anderson v. City of Bessemer, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Based on the scant record before us, we simply cannot say with a ‘definite and firm conviction’ that the trial court erred in finding that Johnson did not establish a prima facie case of racial discrimination.”
Johnson v. State, 823 So.2d at 19-20. See also Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009).
*202 The State was not required to give its reasons for its strikes because McMillan did not establish a prima facie showing of discrimination. “ ‘After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike.... See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991). We will reverse the circuit court’s ruling on the Batson motion only if it is “clearly erroneous.” Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989).’” Killingsworth v. State, 82 So.3d 716, 749 (Ala.Crim.App.2009), quoting, Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992). Therefore, the trial court properly found no prima facie showing was made by McMillan, and the State was not required to come forward with reasons for its strikes.
B.
On appeal, McMillan further contends that the African-American veniremembers who were struck were a heterogeneous group who shared only their race as a characteristic; they were treated differently than whites who gave similar answers on voir dire; there was a lack of meaningful questioning; the percentage of African-Americans struck from the jury created a disparate impact; and the El-more County District Attorney’s office has a long history of discriminating against African-Americans in jury selection. McMillan raises these grounds for the first time on appeal; therefore, any error must rise to the level of plain error. See Rule 45A, Ala.R.App.P.
“ ‘ “For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in ‘purposeful discrimination’ in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).” ’ ”
“ ‘Smith v. State, 756 So.2d 892, 915 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).’
“Ex parte Walker, 972 So.2d [737] at 742 [ (Ala.2007) ].”
Ex parte Sharp, [Ms. 1080959, December 4, 2009] - So.3d -, - (Ala.2009).
McMillan contends that the potential black jurors who were struck by the State were a heterogeneous group who only shared race as a common characteristic. This indicia of discrimination has been described as
“ ‘[e]vidence that the “jurors in question share[d] only this one characteristic— their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.” [People v.] Wheeler, 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [(1978)]. For instance “it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupation, and social or economic conditions,” Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.’ ”
Brown v. State, 74 So.3d 984, 1022 (Ala.Crim.App.2010).
Although the African-American potential jurors struck by the State may appear to be homogeneous on first blush, the information provided by them during voir dire examination is pertinent here, as well as in evaluating whether they were treated differently from potential white jurors. Moreover, their answers establish *203 that there were race-neutral reasons for striking these potential jurors.
Juror 79 was the State’s 11th strike and a female. Although she originally indicated that she tended to be pro-death penalty, she subsequently affirmed that she would base her decision on the law and evidence alone. (R. 505.) She also stated that her husband worked at the Hyundai automotive plant. (R. 386.) Moreover, she stated that she regularly visited her son in jail (R. 458) and that she had served on a jury in a case that was dismissed. (R. 425.)
This potential juror’s husband was employed at the same Hyundai automotive plant where McMillan had been employed, as evidenced by his identification card being a key piece of evidence tying him to the victim’s truck. Moreover, the State also used McMillan’s Hyundai identification card to identify his wallet and to prove the falsity of his statement, because the wallet containing the Hyundai identification card was located in the truck rather than having been in his possession as he alleged in his statement. Thus Juror 79’s husband’s employment was related “to the particular case to be tried.” Batson v. Kentucky, 476 U.S. at 97; Ex parte Branch, 526 So.2d at 623.
Moreover, a juror’s previous service on a jury that dismissed a case has been held to be a race-neutral reason for striking a potential juror. See Watkins v. State, 551 So.2d 421, 422-23 (Ala.Crim.App.1988) (“served on a jury ... where the defendant was found not guilty”; “served on two juries,” one civil and one criminal, neither of which were able to reach a verdict); Smith v. State, 531 So.2d 1245, 1248 (Ala.Crim.App.1987) (“sat on a jury in a criminal case that returned a verdict of not guilty”); Thomas v. State, 520 So.2d 223, 226 (Ala.Crim.App.1987) (“had been a juror on a civil case wherein the monetary award ‘went both ways’ ”); Levert v. State, 512 So.2d 790, 795 (Ala.Crim.App.1987) (prior service in a criminal trial where the verdict was “in great contrast to the theory of the case presented by the prosecution”).
Moreover, Juror 79’s statement that she had visited her son in jail would have provided a race-neutral reason for striking a potential juror. “ ‘Striking a prospective juror because a member of the juror’s family has been convicted of a crime is a valid race-neutral reason under Batson.’ Lewis v. State, 741 So.2d 452, 456 (Ala.Crim.App.1999).” Gobble v. State, 104 So.3d 920, 949 (Ala.Crim.App.2010).
Juror 173 was not listed at trial as one of the potential jurors who was struck based on his race. However, the record indicates that this potential juror was an African-American male and that was the State’s 19th and last strike. This potential juror stated that he was a supervisor at the Hyundai automotive plant where McMillan had worked.[11] Therefore, he was properly struck for race-neutral reasons. See Batson v. Kentucky, 476 U.S. at 97; Ex parte Branch, 526 So.2d at 623.
Juror 114, a female, was the State’s 6th strike. The trial court pointed out that defense counsel had also been made aware that this potential juror had been convicted of third-degree assault in April 2009. (R. 649.) The record does not contain evidence or indicia that any other potential juror had been convicted of an offense. This reason has previously been held to be race neutral.
“The prosecutor’s reason for striking the three black veniremembers based on *204 information concerning prior convictions was a valid and race-neutral reason. Even a suspicion that a potential juror was involved in or connected with criminal activity can be a sufficiently race-neutral reason for a strike.
“ ‘ “A connection with or a founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the exercise of a peremptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991); Powell v. State, 548 So.2d 590 (Ala.Crim.App.1988), aff'd on other grounds, 548 So.2d 605 (Ala.1989); Lynn v. State, 543 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). This connection with or suspicion of criminal activity includes the juror in question, as well as close relatives and friends of the juror. Stephens; Allen v. State, 555 So.2d 1185 (Ala.Crim.App.1989); Lynn.”’
“Baker v. State, 906 So.2d 210, 255 (Ala.Crim.App.2001), rev’d on other grounds, 906 So.2d 277 (Ala.2004), quoting Heard v. State, 584 So.2d 556, 560 (Ala.Crim.App.1991). See also McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004) (‘Peremptory strikes based on the criminal record of a prospective juror do not violate Batson. Darby v. State, 601 So.2d 117 (Ala.Crim.App.1989).’).”
Brown v. State, 982 So.2d 565, 584-85 (Ala.Crim.App.2006), cert. denied, 552 U.S. 1321, 128 S.Ct. 1893, 170 L.Ed.2d 763 (2008).
Juror 176 was a female African-American who was removed by the prosecutor’s 5th strike. She stated that she worked in overnight stocking in electronics at the Millbrook Wal-Mart store. In the present case, the offense occurred at the Millbrook Wal-Mart store, and McMillan’s accomplice purchased speakers on the night of the offense from that store. Thus, this reason would be tied to this particular case. See Batson v. Kentucky, 476 U.S. at 97; Ex parte Branch, 526 So.2d at 623.[12] A white potential juror, Juror 71, stated that she had worked at the Millbrook Wal-Mart but not at the time of the offense. She was struck by defense counsel, using his 6th strike, which presumably closely followed the State’s 5th strike of potential juror number 176.
This potential juror also stated that her brother had dealt with the district attorney’s office for a drug program. See Gorum v. State, 671 So.2d 764, 766 (Ala.Crim.App.1995) (the reason given by prosecutor for striking African-American venire-member, that veniremember’s brother had recently been indicted for selling drugs, was race neutral, stating, “[t]he fact that ‘[a veniremember] or a relative of [his] had been either charged with, prosecuted for, or convicted of a crime’ has been held to be a race-neutral reason. Scott v. State, 599 So.2d 1222, 1228 (Ala.Cr.App.), cert. denied, 599 So.2d 1229 (Ala.1992), overruled on other grounds, Smith v. State, 612 So.2d 1314, 1316 (Ala.Cr.App.1992).”).
She further answered that she had previously served on a jury, that she had relatives in the police department, and that she was related to another prospective juror.
Furthermore, despite McMillan’s contention that there was a lack of meaningful questions asked of the venire, the record *205 contains extensive questioning of the potential jurors. McMillan was not constrained from any examination of the panel. The panel was questioned as to the member’s relationships with any of the parties, attorneys, or witnesses, their feelings about the possible sentences, their knowledge of the offense, and other pertinent matters. Moreover, there were follow-up questions asked concerning answers given by potential jurors that might have indicated a prejudice, such as their place of employment and their addresses. See Brown v. State, 982 So.2d 565, 586 (Ala.Crim.App.2006) (“Although Brown in his brief alleges that the prosecutor failed to engage the three black veniremembers with prior convictions in any form of meaningful voir dire, it was unnecessary to ask these potential jurors any further questions. The record indicates that the entire panel was questioned at length by both parties and that neither party was deprived from asking any potential juror any submitted question. There was no confusion concerning this matter; no further questioning was requested”).
McMillan’s claim that the striking of the jury by the prosecutor reflected a disparate impact on African-American potential jurors is not established by the record. He contends that the potential juror panel was only eight percent black and that African-Americans were removed for cause.[13] Thus, McMillan argues, the prosecutor’s use of four strikes to remove African-American potential jurors “create[d] a disproportionate impact.” (McMillan’s brief 34.)
However, as noted by the prosecutor at trial, three of the jurors who served on the case were African-American. The trial court also concluded that there was no disparate treatment because 25 percent of the jury was African-American, while 16 percent of the population of Elmore County was African-American. There is no inference of discriminatory intent by the State’s use of 4 of its 19 strikes to remove African-Americans from the venire. See Brown v. State, 74 So.3d 984, 1024 (Ala.Crim.App.2010) (despite Brown’s argument that there was “ ‘a stark statistical disparity in the prosecution’s use of its strikes,’ ... [a]n examination of the percentages of each of the categories set forth above shows that the composition of the jury is substantially similar to the composition of the venire”).
Although McMillan contends that the district attorney’s office has a long history of striking jurors based on race, “this was not reflected in, or indicated by, the record. See Sharifi v. State, 993 So.2d 907, 928 (Ala.Crim.App.2008) (no inference from the record of discriminatory use of peremptory challenges by the prosecutor despite Sharifi’s argument that Madison County has a long history of violating Bat-son and that the number of strikes used by the State indicated prejudice).” Dotch v. State, 67 So.3d 936, 982 (Ala.Crim.App.2010).
McMillan refers to two cases in which the Elmore County District Attorney’s office was held to have possibly entered its strikes based on race.
In Bell v. Haley, (No. CIV.A. 95-T-913-N, Dec. 5, 2001) (not reported in F.Supp.2d), the federal district court determined, under the guidelines of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that the district attorney’s office had used its strikes in a discriminatory manner because it struck the *206 remaining five potential African-American jurors from the panel.[14] The prosecutor was required to give reasons for her strikes. Ultimately, the court noted that, although there was a strong probability that Bell had made a valid claim, “[t]he evidence does not prove beyond any doubt that race was a motivating factor in [the district attorney’s] decision to strike all the African-American venire members.” Bell v. Haley, supra, at n. 45.
In Henderson v. State 549 So.2d 105 (Ala.Crim.App.1987), this Court determined that because the trial occurred before the United States Supreme Court released its decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Henderson was entitled to a hearing to present any evidence of discrimination in the selection of the jury that heard his case. The trial court found that the prosecutor was not able to provide race-neutral reasons for 2 of the 10 strikes.
These two cases alone, which were never brought to the trial court’s attention, do not raise an inference that the Elmore County District Attorney’s office has a history of prejudicial jury striking. Perkins v. State, 808 So.2d 1041, 1076 n. 7 (Ala.Crim.App.1999), affirmed, 808 So.2d 1143 (Ala.2001), cert. granted, judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002) (“Although Perkins does cite two federal cases in which the court found Batson violations by a prosecutor in Tuscaloosa County, this, alone, is not sufficient to establish a history of discriminatory striking for the prosecutor in this case.”). See also Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] - So.3d -, - (Ala.Crim.App.2009) (“ ‘Dunaway cites this Court to one case, Morrison v. Jones, 952 F.Supp. 729 (M.D.Ala.1996), in support of his contention the Barbour County District Attorney’s Office has a history of racial discrimination in jury selection. This Court will not find a “pattern of discrimination” based on one case out of the thousands criminal cases that have been prosecuted in Barbour County.’ ” [15]).
Moreover, there was no pattern of strikes used by the State to challenge African-American potential jurors, as described in Ex parte Branch, 526 So.2d at 623. As illustrative of the types of evidence that can be used to overcome an inference of discrimination, the Branch court stated that the State could show that “[t]here is no evidence of a pattern of strikes used to challenge African-American jurors; e.g., having a total of 6 peremptory challenges, the state used 2 to strike African-American jurors and 4 to strike white jurors, and there were African-Americans remaining on the venire.” Id.
In the present case, McMillan failed to make a prima facie showing of discrimination by the State in striking the jury. Thus, the trial court committed no error in determining that McMillan failed to meet his burden of proof. Further, the record indicates that there was no plain error in the prosecutor’s striking of the four African-American potential jurors.
*207 III.
McMillan argues that the trial court’s rejection of the jury’s verdict of life imprisonment without parole rendered his death sentence unconstitutional under State and federal law. Specifically, he contends that the trial court improperly used his juvenile adjudications to assign little weight to the statutory and nonstatutory mitigating circumstances; that the trial court failed to appropriately weigh established nonstatu-tory mitigating circumstances; that the trial court placed undue influence on the one aggravating circumstances; and that the trial court’s rejection of the jury’s verdict is not supported by the law.
A.
McMillan, relying heavily on Ex parte Burgess, 811 So.2d 617 (Ala.2000), contends that the trial court improperly relied on his juvenile adjudications to assign little weight to the statutory mitigating factors regarding his age and lack of significant history of prior criminal activity, as well as the nonstatutory factors established in this case.
In Ex parte Burgess, supra, Burgess argued that the trial court erred in overriding the jury’s recommendation of life imprisonment without parole by improperly relying on his juvenile history. He argued that his juvenile adjudications should not have been used to negate the statutory mitigating circumstances concerning his age and lack of significant criminal history. The Alabama Supreme Court determined that the trial court had abused its discretion in its use of Burgess’s juvenile adjudications as follows:
“Section 13A-5-47(b), Ala.Code 1975, requires that the trial court order and receive a written presentence investigation report ‘[bjefore making the sentencing determination,’ and that ‘[t]he report and any evidence submitted in connection with it shall be made part of the record in the case.’ Rule 26.3(b), Ala.R.Crim.P., provides for what may be contained in such a presentence report. When a defendant has a significant juvenile record, his or her teenage difficulties will appear as part of the presentence , report. However, under the Alabama capital-sentencing scheme, juvenile adjudications are not convictions and cannot be considered as prior criminal activity. Freeman v. State, 555 So.2d 196, 212 (Ala.Crim.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. § 13A-5-51(1), Ala.Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala.Crim.App.1994).
“The fact that a trial court has access through the presentence report to the juvenile record of a defendant convicted of a capital crime, but cannot consider juvenile adjudications to negate the mitigating circumstances of the lack of any significant history of prior criminal activity, appears to be a contradiction. In discussing that issue, the Court of Criminal Appeals concluded that although juvenile adjudications cannot be used to negate the mitigating circumstances, the trial court can consider them when conducting the weighing process required in capital cases. The Court of Criminal Appeals stated:
“ ‘Although it is well-settled law in Alabama that juvenile adjudications cannot be used to negate the statutory mitigating circumstances that the defendant has no significant history of prior criminal activity, Freeman, supra, 555 So.2d at 212, the courts of this state have never held that the trial court must entirely ignore a de *208 fendant’s juvenile adjudications in performing its ‘weighing’ duties. The trial court’s consideration of a defendant’s juvenile adjudications when conducting the weighing process offends neither general constitutional principles nor specific provisions of Alabama law. In fact, Alabama’s capital punishment statute contemplates that the trial court will have any prior juvenile record of the defendant before it when it is deciding upon the proper sentence: pursuant to § 13A-5^47, Ala Code 1975, the trial court is required to consider the presentence report of a defendant convicted of capital murder, and Rule 26.3(b)(2), Ala.R.Crim.P., specifically provides for the inclusion of the defendant’s prior juvenile record in the presen-tence report.
“‘To hold that the trial court is prohibited from considering a defendant’s juvenile adjudications in its individualized assessment of the weight to assign to the statutory mitigating circumstances of “no significant history of prior criminal activity” would obligate the trial court to assign precisely the same weight to this mitigating circumstances in every case where, such as here, a juvenile defendant is convicted of capital murder. Under this view of the capital sentencing scheme, two juveniles, both the same age and both convicted of capital murder, one with no prior juvenile record and the other with a very significant prior juvenile record, would necessarily benefit equally from the statutory mitigating circumstance “no significant history of prior criminal activity.” This would amount to an endorsement of the sort of numerical “tallying” disallowed by § 13A-5-48, Ala.Code 1975, and an abjuration of the weighing function mandated by § 13A-5-47(e), Ala.Code 1975.
“ ‘Alabama’s capital punishment statute does not specify the matters the trial court may consider when engaging in the process of weighing the aggravating circumstances and the mitigating circumstances in a particular case. Nor does the statute require the trial court to make express findings explaining the process by which it weighed the aggravating circumstances and the mitigating circumstances. We conclude that a trial court may, consistent with Alabama law, deem a defendant’s juvenile adjudications to be a relevant consideration in its assessment of the weight to assign to the statutory mitigating circumstances of a defendant’s lack of a significant criminal history and a defendant’s age at the time of the offense.’
“[Burgess v. State], 811 So.2d [557] at 606 [ (Ala.Crim.App.1998) ].
“We agree with the Court of Criminal Appeals’ conclusion that a trial court may consider a defendant’s juvenile adjudications to be a relevant consideration in deciding what weight to assign to the statutory mitigating circumstances of a defendant’s lack of a significant prior criminal history and a defendant’s age at the time of the offense. Other courts considering this dilemma have come to the same conclusion as did the Court of Criminal Appeals. See, e.g., United States v. Pretlow, 770 F.Supp. 239, 243 (D.N.J.1991) (applying New Jersey law); Scott v. Dugger, 686 F.Supp. 1488, 1508 (S.D.Fla.1988), aff'd, 891 F.2d 800 (11th Cir.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990) (applying Florida law); State v. Bays, 87 Ohio St.3d 15, 33-34, 716 N.E.2d 1126, 1145 (1999), cert. denied, 529 U.S. 1090, 120 S.Ct. *209 1727, 146 L.Ed.2d 647 (2000); State v. Rodriguez, 656 A.2d 262, 277-78 (Del.Super.Ct.1993). Nevertheless, Alabama law explicitly precludes a trial court from using juvenile adjudications to negate the mitigating circumstance of no significant history of prior criminal activity. Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). In other words, during the sentencing process in a capital case, the trial court may use a defendant’s juvenile record to diminish the weight to be accorded the mitigating circumstance of that defendant’s lack of a significant history of prior criminal activity, as well as the mitigating circumstance of that defendant’s age at the time he or she committed the capital offense, but the trial court may not use the juvenile record as the basis for giving little or no weight to such mitigating circumstances.
“We disagree, however, with the Court of Criminal Appeals’ conclusion that the trial court in this case did not improperly consider Burgess’s juvenile adjudications to negate the mitigating circumstances it found to exist. The trial court’s sentencing order shows that Burgess’s juvenile record was a conspicuous and dominating factor in the trial court’s weighing process.
“The statements contained in the trial court’s painstaking written order in this very difficult case reflect that the trial court relied upon Burgess’s juvenile adjudications to give nominal weight not only to the two statutory mitigating circumstance, but also to other mitigating circumstance, including the jury’s recommendation. The trial court’s use of Burgess’s juvenile record — use indicated by the court’s numerous references to that record — to discount to inconsequen-tiality the numerous mitigating circumstance, in favor of the one aggravating circumstance, was an abuse of discretion.”
Ex parte Burgess, 811 So.2d at 624-28.
Although the Court seems to have based its holding on § 13A-5-51(1), Ala.Code 1975, which allows only convictions to be used to negate the mitigating circumstance of lack of prior significant criminal history,[16] this prohibition appears to have been expanded by the holding in Ex parte Burgess to include the mitigating circumstance of age.
Subsequently, in Ex parte Carroll, 852 So.2d 833 (Ala.2002), the Alabama Supreme Court confirmed its holding in Ex parte Burgess, supra, and found that the trial court had improperly overridden the jury’s recommendation of life imprisonment without parole. The Court determined that, because the trial court had improperly based its negating of the statutory mitigating circumstances of age and lack of prior criminal history on Carroll’s juvenile adjudications, it had violated the holding in Ex parte Burgess. However, the Court further examined the other reasons given by the trial court in negating these mitigating circumstances, i.e., the pain suffered by the victim’s family and the “ ‘great weight’ ” given the jury’s recommendation. The Court discounted both of these latter reasons because the victim’s family had asked that Carroll be sentenced to life imprisonment without parole and *210 because the jury’s recommendation was not given the considerable weight to which it was entitled because of the number of jurors, 10 of the 12 jurors in Ex parte Carroll, recommending life imprisonment without parole,[17] as well as the lack of information known only to the trial court and not to the jury.[18] The Court also reiterated a listing of the factors indicating that a sentence of death was excessive that had previously been enunciated in a special writing in a prior decision in Ex parte Carroll, 852 So.2d 821 (Ala.2001). In that list, the Court notes the jury’s 10-2 recommendation of life imprisonment, the recommendation of the victim’s family, Carroll’s age of 17, and the circumstances of that offense, particularly that Carroll had made no attempt to kill the witnesses to the offense.[19]
In the present case, as in Ex parte Burgess, supra, and Ex parte Carroll, supra, the trial court considered McMillan’s prior adjudications in weighing the applicable statutory and nonstatutory mitigating circumstances and in diminishing these factors. However, the holdings in Ex parte Burgess and Ex parte Carroll expressly state that a trial court may consider juvenile adjudications in its weighing process. These decisions require only that the court not use the adjudications as the basis for negating or diminishing the two statutory mitigating circumstances of age and lack of prior criminal history. Thus, there is no prohibition against their use as to nonstatutory mitigating circumstances.
in light of the entire sentencing order in the present case, the trial court clearly also based its decision to accord little weight to these mitigating factors on reasons other than the juvenile adjudications that were both proper and supported by the record. Further, even if the trial court’s determination in according little weight to McMillan’s age and lack of prior significant criminal history based partly on his juvenile adjudications was erroneous, it was harmless in this case. The trial court’s weighing process in this case, particularly as to the factors set out in Ex parte Carroll, supra, that are to be considered, rendered any error resulting from the consideration of the juvenile adjudications harmless. Rule 45, Ala.R.App.P.
“ ‘No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’
“Rule 45, Ala.R.App.P.
“In Chapman v. California, 386 U.S. 18, 24 (1967), the United States Supreme Court held that before the violation of certain constitutional rights can be held to be harmless, the appellate court must be able to declare a belief that it was harmless beyond a reasonable doubt. *211 ‘The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’ Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179 (1999).”
Billups v. State, 72 So.3d 122, 134 (Ala.Crim.App.2010).
In the present case, the trial court made the following findings in weighing the statutory mitigating circumstances:
“This Court finds the existence of two statutory mitigators. Those are that the defendant had no significant history of prior criminal activity and the age of the defendant at the time of the crime.
“During the trial of this case the jury was informed that the defendant had been convicted of assault 3rd degree in December of 2006. The law of this state generally requires that misdemeanor convictions may not be considered for the purposes of negating this mitigator. However, the misdemeanor offense of assault 3rd degree can be used to negate the mitigating circumstance of ‘no significant history of prior criminal activity’ because it is a crime of violence. Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001).
“Accordingly, even though McMillan has no prior felony convictions, the Court finds that this statutory mitigator is significantly diminished by his assault 3rd degree conviction.
“Additionally, the Court may use a defendant’s juvenile record to diminish the weight to be accorded the mitigating circumstance of that defendant’s lack of significant history of prior criminal activity as well as the mitigating circumstance of that defendant’s age at the time he committed the capital offense. Ex parte Carroll, 852 So.2d 833 (Ala.2002). As stated elsewhere in this order, McMillan has a significant juvenile record consisting of adjudications of guilt in two cases of domestic violence 3rd degree, one case of assault 3rd degree, one case of menacing, one case of reckless endangerment, one case of theft 3rd degree and one case of burglary 3rd degree.
“With regard to the statutory miti-gator dealing with the age of the defendant at the time of the crime, the evidence has established that McMillan was 18 years of age at the time that he murdered James Bryan Martin. Therefore, this Court finds that this statutory mitigator does exist. However, based upon his juvenile record and other factors this Court assigns little weight to this factor.
“Not only did McMillan have a juvenile record of violence, but he also possessed the pistol that he used to kill James Bryan Martin as well as ammunition for other weapons. McMillan also had been emancipated prior to committing this crime, had an adult conviction for assault 3rd degree and had obtained a job.”
(C. 18-19.)
Here, eight jurors recommended life imprisonment without parole. In both Ex parte Burgess, supra, and Ex parte Carroll, supra, 10 members of the jury recommended life imprisonment without parole. Moreover, the victim’s family testified to the hardship and pain caused the family by the loss of the victim and never requested, as did the family in Ex parte Carroll, supra, that McMillan be sentenced to life imprisonment without parole.
Moreover, as reflected in Ex parte Carroll, supra, the facts and circumstances surrounding the offense are to be consid *212 ered in determining whether the court’s reliance on the defendant’s juvenile adjudications was the basis for his decision to negate or to diminish the statutory or non-statutory mitigating circumstances. The Court considered Carroll’s role in the murder in finding that the death penalty was inappropriate or excessive in that case. In the present case, the facts surrounding McMillan’s role in the offense clearly supported the trial court’s determination that the override of the jury’s verdict was proper.[20]
The trial court explicitly stated that it was basing its decision to give little weight to the mitigating factor of McMillan’s lack of significant prior criminal history on his adult conviction for third-degree assault. This has been held to be proper. Stallworth v. State, 868 So.2d 1128, 1173 (Ala.Crim.App.2001) (holding that a conviction for third-degree assault, a “ ‘significant crime,’ ” can negate the mitigating circumstance of lack of prior significant criminal history because “[t]o be convicted of assault the victim must have suffered from some type of physical injury. See § 13A-6-22, Ala.Code 1975”). The trial court also stated that it considered other factors in determining that McMillan’s age was entitled to little weight. In its sentencing order, the trial court noted that McMillan was emancipated, that he had been employed, that he had purchased ammunition and had obtained a weapon before the murder, and that he had been convicted of third-degree assault.
Based on the record and facts of this case, the trial court’s decision to accord little weight to the two mitigating circumstances based on McMillan’s juvenile adjudications was not erroneous, and, even had we determined that it was error, at most, it was harmless error.
B.
McMillan contends that the trial court failed to give the appropriate weight to established nonstatutory mitigating circumstances. He argues that because of the magnitude of the nonstatutory mitigating evidence and the fact that the State did not introduce any evidence to dispute it, the trial court should not have diminished its weight. Specifically, McMillan refers to the nonstatutory mitigating evidence argued by defense counsel — that he had been raised in extreme poverty, that he had been abandoned by his mother, that he had been physically abused, that he had been raped as a child, that he had been a witness to abuse, that he had been raised in the home of alcoholics and drug addicts, that he did not get proper treatment, that he had no positive male role models, that he had psychological and emotional difficulties, and that he functioned in the borderline range of intellectual functioning. He alleges that because the trial court considered only that his sister was raised in the same environment and yet lived a successful life, its decision to accord little weight to this mitigation was improper.
*213 Despite McMillan’s contention that the State did not refute this mitigating evidence, the record reveals that during the sentencing hearing, the State argued that McMillan had never mentioned any sexual abuse until he was interviewed by an expert in regard to these capital-murder charges. Additionally, on cross-examination of McMillan’s sister, the State elicited testimony that the events this witness had described concerning her mother’s prostitution and substance abuse in New York had occurred before McMillan was born. (R. 1547-48.) Moreover, she acknowledged that her mother was never arrested for prostitution, that she (the sister) was living a productive life, and that McMillan had been living with her in her apartment at the time of the offense. McMillan’s aunt testified that she had taken McMillan and his sisters into her home to raise and, with the help of the Department of Human Resources, did the best that she could. She stated on cross-examination that McMillan had “loved” school.
The State also introduced evidence indicating that a counselor who had interviewed McMillan while he was in detention found no evidence of psychosis and felt that McMillan “‘needed serious consequences for his behaviors.’” (R. 1627.) The State further presented evidence indicating that one of McMillan’s foster mothers had offered to enroll McMillan in the basketball program at the local YMCA, but he had refused. Evidence was introduced revealing extensive aggressive and bad behavior by McMillan.
As to the nonstatutory mitigating circumstances, the trial court made the following findings:
“This Court has considered all of the non-statutory mitigating evidence presented by McMillan. As outlined below, McMillan submitted testimony and argument to the jury on the following non-statutory mitigating circumstances: that he was raised in extreme poverty; that he was abandoned by his mother; that he was physically abused as a child; that he was raped as a child; that he was a witness to his mother’s and sister’s abuse; that he was raised in the home of an alcoholic/drug addict; that he did not get the treatment he needed; that he had no positive male role models; that he suffered from psychological and emotional difficulties; and that his intellectual functioning was in the borderline range.
“As stated earlier, the Defense called a number of witnesses who testified during the penalty phase of this trial. McMillan’s sister, Ella Torrance, testified that she, her sister and McMillan were basically left to fend for themselves by their alcoholic and drug addicted mother. Although Ms. Torrance and her sister were born while their mother lived in New York and abandoned them there, McMillan was not born until after they arrived in the Montgomery and Macon County area. They lived with her mother’s abusive boyfriend and it was claimed that he physically abused the children as well as their mother by beating them and threatening to shoot them with a pistol. The mobile home that they resided in often did not have electricity nor did it have running water. Further, there was very little food available for the children to eat while they were growing up.
“Ms. Torrance also reported that McMillan had been sexually abused by the son of their mother’s boyfriend. It is noted however, that this report of sexual abuse is not documented in any record until McMillan reported it to Dr. Karl Kirkland during Dr. Kirkland’s mental evaluation for the purposes of *214 determining whether this case should proceed to trial.
“McMillan’s aunt, Carol Weaver Christian, testified to facts similar to those as testified by McMillan’s sister, Ella Torrance. Ms. Christian took temporary custody of these three children and attempted to raise them with her four children. However, the children had to go back into the custody of the Department of Human Resources, as Ms. Christian was unable to care for all of them. Since the trial, this Court has learned, based upon its review of McMillan’s juvenile records, that his aunt also requested to be relieved of her temporary custody agreement because she could not govern McMillan’s negative behavior.
“Mr. Teal Dick, a licensed professional counselor and director of the Alabama Family Resource Center, testified as well based upon his review of the records of the Department of Human Resources and his interviews with McMillan and some of McMillan’s family members. Mr. Dick’s testimony revealed that McMillan and his family’s contact with the Department of Human Resources began in 1995. These records confirmed many of the same reports as testified to by McMillan’s sister with regard to the living conditions and threats and abuse suffered by McMillan, his sisters and his mother.
“By the time that McMillan was committed to foster care by the Department of Human Resources he was already aggressive and angry. Within a six-year period McMillan was in and out of twenty-five different homes and placements. At one point, one of his foster parents even tried to get him involved in YMCA basketball but he refused to do so.
“Emma Cosby, also known as Emma Peoples, a social worker who had contact with McMillan through her work with SAFY, a therapeutic foster care organization, testified on McMillan’s behalf as well. She stated that it was her opinion that ‘the system’ had failed McMillan while he was growing up. However, in 2001 she tried to take steps to control his rebellious and aggressive behavior but was unsuccessful. She reported that McMillan had threatened she [sic] and a foster parent with what she later found out was an electric toothbrush. After seeking the intervention of law enforcement, in April 2001, McMillan further threatened Ms. Cosby by telling her that she would find her new born baby’s head lying in a pool of blood when she got home. As a result of this behavior, McMillan was placed in the HIT program, which is a detention type setting. McMillan was enrolled in special education classes while in school due to his tendency to threaten others and he was in fact removed from the Safety Net Residential Program after he assaulted another student.
“Eddie Tucker, McMillan’s biological father testified during the penalty phase as well. He established that he had very little contact with McMillan but would have been willing to take him in and raise him in his home if he had had the opportunity.
“Dr. Kimberly Ackerson also testified on behalf of the Defense. Dr. Ackerson is a forensic psychologist with a private practice in Birmingham, Alabama. Dr. Ackerson reviewed the DHR records, met with the defendant and spoke with his aunt and sister. Dr. Ackerson did not do any testing of McMillan although she did review the report that was generated by Dr. Karl Kirkland who did. Dr. Kirkland, in his evaluation prepared for this Court conducted a number of tests in arriving at his diagnostic im *215 pressions and an IQ score of 76 for McMillan.
“Dr. Ackerson’s testimony was basically a recap of the testimony of the other witnesses. She did, however, testify from the records that it had been determined by other professionals that McMillan knew the difference between right and wrong and that in 2001 Dr. Majure had reported that there was no evidence that McMillan was suffering from psychosis and that McMillan was aware of and in control of his behavior. She further acknowledged that her review of the records revealed that McMillan’s alleged sexual abuse was first reported to Dr. Kirkland by McMillan at the time of his interview.
“With regard to the Defense’s claim of borderline intellectual functioning the Court notes that Dr. Kirkland’s report established that McMillan has an IQ of 76. McMillan is not mildly retarded, but functions in the classification range immediately above the mild mental retardation as well as in the range of low average intellectual functioning. Dr. Kirkland, in his report, further stated that while McMillan functions on a fourth grade reading level, his intellectual functioning and social adaptive functioning were on a high borderline to low average intellectual level.
“In reviewing and considering the non-statutory mitigating circumstances, as a whole, this Court assigns very little weight to them.
“McMillan’s sister, Ella Torrance, was raised in the same home and under the same conditions as he was. She graduated from school, owns her own car, has a good job, supports herself and has not been involved in any criminal conduct.”
(C. 23-28.)
The trial court’s findings clearly indicate that it considered all the nonstatutory mitigating evidence presented and weighed it against the evidence tending to discount it. The evidence indicating that McMillan’s sister was able to overcome her upbringing was not the only evidence weighing against McMillan’s evidence of his background. The trial court did not abuse its discretion.
The Alabama Supreme Court in Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), found that the trial court did not abuse its discretion in failing to find the existence of any nonstatutory mitigating circumstances because it was clear that the court had understood its duty to consider these circumstances. The Court stated:
“The Court of Criminal Appeals correctly stated the following in Cochran v. State, 500 So.2d 1161, 1176 (Ala.Cr.App.1984), reversed and remanded on other grounds, 500 So.2d 1179 (Ala.1985), 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987):
“ ‘It is not required that evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the trial judge. Mikenas v. State, 407 So.2d 892, 893 (Fla.1981), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).
“ ‘ “Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rest with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979).” Smith v. State, 407 So.2d 894, 901 (Fla.1981), *216 cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).’ ”
Ex parte Hart, 612 So.2d at 542. Moreover,
“As the Alabama Supreme Court stated in Ex parte Giles, 632 So.2d 577 (Ala.1993):
“‘We are aware of no authority for Giles’s legal proposition that these [mitigating] factors, assuming they were conclusively established, mandate a sentence of life imprisonment. Although evidence of nonstatutory factors, such as that presented by Giles, cannot be excluded from the sentencing tribunal, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), such evidence is only “potentially mitigating.” Skipper v. South Carolina, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986) (emphasis added). The sentencing tribunal, and, on appeal, the reviewing court, determines the weight to be assigned to each factor. Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, Hart v. Alabama, [508] U.S. [953] 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).’
“632 So.2d at 585.”
Calhoun v. State, 932 So.2d 923, 974-75 (Ala.Crim.App.2005).
Here, the record and sentencing order indicate that the trial court properly considered these nonstatutory mitigating factors.
C.
McMillan argues that the trial court placed undue influence on the one aggravating circumstance that the murder was committed while he was engaged in the commission of a robbery. § 13A-5-49(4), Ala.Code 1975. In making this argument, McMillan argues his disapproval of the practice of “double-counting” the robbery/murder circumstance and notes that murder during a robbery accounts for two-thirds of the capital offenses in Alabama.
In Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010), this Court held that the one aggravating circumstance that the capital offense was especially heinous, atrocious or cruel as compared to other capital offenses outweighed the “ ‘over twenty mitigating circumstances’ ” Gobble alleged were proffered and proved by the defense. This Court stated:
“Section 13A-5A8, Ala.Code 1975, provides:
“ ‘The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.’
“ ‘The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.’ Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984). ‘[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is *217 not susceptible to proof by either party.’ Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990). Clearly, the circuit court gave the mitigating circumstances little weight in light of the brutal and heinous aggravating circumstance that was present in this case. ‘The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority.’ Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). We agree with the circuit court’s findings.”
Gobble v. State, 104 So.3d at 976. See also Lee v. State, 898 So.2d 790, 873 (Ala.Crim.App.2001), cert. denied, 898 So.2d 874 (Ala.2004), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004) (holding that the trial court was correct in determining that the one aggravating circumstance that the murder was committed during a robbery outweighed the two statutory mitigating circumstances of lack of significant history of criminal activity and the defendant’s age at the time of the offense, as well as a number of nonstatuto-ry mitigating circumstances).
Furthermore, there was no error in that the only aggravating circumstance, which is one included in § 13A-5-49(4), Ala.Code 1975, was also an element of the offense.
“We have previously addressed this issue in other cases and have held that the fact that a particular capital offense necessarily includes one or more aggravating circumstances as specified in Ala. Code 1975, § 13A-5-49, shall not preclude the finding and consideration of that relevant circumstance or those circumstances in determining the sentence. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996). Furthermore, Alabama courts have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense. Smith v. State, supra; Heath v. State, 455 So.2d 898 (Ala.Cr.App.1983), affirmed, 455 So.2d 905 (Ala.1984), affirmed, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).”
Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997).
D.
McMillan argues that the trial court’s rejection of the jury’s verdict is not supported by the law. McMillan contends that pursuant to Ex parte Carroll, supra, the trial court may consider, in overriding the jury’s advisory verdict, information not known by the jury only if that information may properly be used to undermine a mitigating circumstance. Thus, McMillan surmises that the trial court determined that the jury was unable to follow the law and it placed substantial weight on information not known to the jury.
However, the record confirms that the trial court looked to the factors enumerated in Ex parte Carroll, as set out previously. See Part III.A. The trial court made the following extensive findings concerning the jury’s advisory verdict:
“In Carroll, ten jurors recommended life without parole. Here, eight jurors made such a recommendation, one number greater than the statutory minimum to allow a life without parole recommendation.
“Just as this Court is unable to read the minds of any witnesses or parties, likewise it is unable to read the minds of the jury. However, the Court had an opportunity to work with and observe *218 these jurors for almost a week and a half.
“Based on the overwhelming evidence in this case and the unanimous verdicts on both counts of capital murder, it is not easy to determine why eight members of the jury voted against the death penalty in this case. It is highly possible that fewer than eight jurors initially voted for life without parole and that the number of those jurors voting for life without parole only increased as they grew tired of the process and dealt with the weight that a death recommendation would have on each of them.
“In the end, this Court is unable to specifically say why the jury was unable to follow the law to make a recommendation of death in this case. The only fact that is known, is that two more jurors ultimately voted for the death penalty in this case than in Carroll. The Court finds that that weighs in favor of an override of the jury’s recommendation in this case; at least in comparison to Carroll.
“B) Conflicting Evidence of the ‘Trigger Man’:
“While the facts in CaiToll may have left some doubt as to the identity of the ‘trigger man,’ all of the evidence in this case points to McMillan as the perpetrator. As outlined in great detail earlier in this order, the State’s evidence established beyond all reasonable doubt that McMillan intentionally murdered James Bryan Martin while robbing him of his truck. The jury unanimously returned a verdict in approximately an hour and twenty minutes finding that McMillan killed James Bryan Martin. If there was any residual doubt as to any other person’s involvement in these murders, as there apparently was in Carroll, it is not founded upon the evidence presented at trial or in the jury’s guilt phase verdicts. Accordingly, in comparison to Carroll, judicial override is proper in this case.
“(C) Recommendation of Victim’s Family:
“In Carroll, the victim’s family recommended Carroll not receive the death penalty. No person from the Martin family has made any such recommendation in this case. In fact, members of James Bryan Martin’s family were properly precluded from giving any testimony with regard to their recommendation of McMillan’s sentence in one way or another. Accordingly, in comparison to Carroll, judicial override is proper in this case.
“D) Facts of the Crime/Not Killing the Witnesses:
“Although in Carroll, the defendant did not kill all the witnesses and the Supreme Court found that that factor weighed in favor of a life without parole sentence that is not the’case here. The main witness to McMillan’s robbery was James Bryan Martin and McMillan killed him so he could escape in Martin’s truck. The surrounding circumstances of this crime did not afford McMillan with an opportunity to kill or not kill other potential witnesses. Accordingly, in comparison to Gam-oil, judicial override is proper in this case.
“E) Additional Facts Unknown to the jury:
“Finally, Carroll also allows this Court to consider information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance. This Court places substantial weight on this factor in this case.
“This Court has had the benefit of working on this case since shortly after the Grand Jury returned the indictment. *219 It has held numerous evidentiary hearings in preparation for the trial of this case. This Court has had an opportunity to observe McMillan’s demeanor and conduct throughout these proceedings. He has shown no emotion nor has he indicated any remorse whatsoever.
“In the course of preparing the mental evaluation Dr. Karl Kirkland interviewed McMillan. McMillan concocted a story about a ‘drug deal gone bad’ when relating the facts of this case to Dr. Kirkland. Obviously, the evidence presented in this case including the video evidence in no way supports such a story.
“During the penalty phase of this case the jury was informed that McMillan had been convicted of assault 3rd degree on December 20, 2006 in Dallas County. The jury was not told that the facts supporting this crime to which McMillan pled guilty, established that McMillan was chasing another student at the Safety Net Program, caught up with him and pushed him to the ground injuring his knee because the other student had told on McMillan for choking him.
“Additionally, McMillan has a substantial juvenile record dating back to the age of 12. During the almost six years between December 8, 2000 and November 1, 2006, McMillan was adjudicated guilty in two cases of domestic violence 3rd degree, one case of assault 3rd degree, one case of menacing, one case of reckless endangerment, one case of theft 3rd degree and one case of burglary 3rd degree. Of these seven offenses, only two of them are nonviolent offenses.
“McMillan’s domestic violence adjudications both involved altercations that he had with one of his foster parents, Wilhemenia Boykin. On two occasions he hit her in the head and shoulder and in another he threatened to kill her. Twenty-nine months later he was adjudicated guilty of reckless endangerment, menacing and assault 3rd degree arising out of him shooting a ‘BB’ gun at students at Loachapoka High School, shooting at one young man specifically and shooting a young lady in the thigh.
“McMillan has been incarcerated in the Elmore County Jail since his arrest in this case. During this time he has assaulted at least two different inmates. One of those has been assaulted with a bar of soap inside a sock and a second one was cut on his right eye, shoulder and hand using a jail-made ‘shank.’ During the trial of this case and on July 8, 2009, jail-made handcuff keys were found in McMillan’s constructive possession. Additionally, a few weeks before trial the lock on McMillan’s cell door was found bent so that the door would not close and lock correctly.
“In addition to these facts, shortly after McMillan and his codefendant Rondarrell Williams were arrested, McMillan sent a letter to Williams telling him to lie about what happened. In September 2008 McMillan threatened Williams’s life and the life of his family if Williams testified against him in this case.
“Since none of the factors listed by the Alabama Supreme Court in Carroll ‘tips the scales in favor of following the jury’s recommendation’ this Court finds no legal prohibition for overriding the jury’s recommendation.
“These facts significantly diminish the statutory and non-statutory mitigating circumstances that have been presented in this case.
“Justification For Override
“Under Alabama Law the trial judges are required to make the ultimate determination with regard to sentencing. In Harris v. Alabama, 513 U.S. 504 (1995), *220 the Supreme Court of the United States held:
“ ‘[T]he Constitution permits a trial judge, acting alone, to impose a capital sentence. It is thus not offended when a state further requires a sentencing judge to consider a jury’s recommendation and trust a judge to give it the proper weight.’
“This responsibility of making this decision has been placed upon the trial judges of this state in general and this Court in particular by the legislature through the Alabama Criminal Code.
“This Court has had the opportunity to try and impose the sentence in a number of capital murder cases over the last twenty-two years and eight months. In some of these cases, this Court has imposed death. In others, it has imposed a sentence of life without parole. In each of these cases this Court has followed the recommendation of the jury. In this case however, the Court finds that a proper weighing of the aggravating circumstance and mitigating circumstances does not support a sentence of life without parole.
“The Court is aware of many cases in Alabama over the years where the death penalty has been upheld as the appropriate punishment for the capital offense of an intentional murder during the course of committing a robbery 1st degree. In fact this Court has been affirmed most recently on direct appeal of Charlie Washington v. State of Alabama, 922 So.2d 145 (Ala.Crim.App.2005), cert. denied June 16, 2005, Ala. S. Ct, cert. denied, Washington v. Alabama, 546 U.S. 1142 (2006), in its imposition of a death sentence after Washington was convicted of an intentional murder during a robbery 1st degree. Additionally, the Court of Criminal Appeals in Bush v. State, 92 So.3d 121 (Ala Crim.App.2009), again affirmed the trial court in ruling on a Rule 82 appeal when the trial court sentenced the defendant to death after having received a life without parole recommendation from the jury with a twelve to nothing vote. Further, in Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008), the trial court was again affirmed on a review of a Rule 32 [Ala.R.Crim.P.,] appeal on a robbery murder when the trial judge sentenced the defendant to death after receiving a jury recommendation of life without parole by a vote of eleven to one.
“No juror is in a position to compare this case with other capital cases as they do not have the resources and benefit of the decisions from the appellate courts nor the personal experience received by trying and deciding these types of cases. When this Court compares the facts of this case to similar cases there is little question that ‘when compared to other cases with similar facts, a sentence of death is not in any way a disproportionate sentence’.”
(C. 12-28.)
Here, the trial court properly considered the pertinent factors in its decision to override the jury’s advisory verdict, as expressed in Ex parte Carroll. In Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010), this Court stated:
“ ‘The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the “triggerman” or a recommendation of leniency by the victim’s family; the jury’s recommenda *221 tion may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’
“852 So.2d at 836.
[[Image here]]
“Further, the circuit court noted that in arriving at its decision, it had,
“ ‘considered the evidence presented at trial, the evidence presented during the penalty phase in the jury’s presence, the jury’s 10 to 2 advisory verdict for Life Without Parole, the Pre-Sentence Investigation Report (although some portions of the report were expressly excluded from the Court’s consideration such as Youthful Offender convictions), additional testimony at the sentencing phase, and arguments presented at the sentencing hearing.’
“(C.R. 26.) Because the circuit court clearly set forth its reasons for ‘giving the jury’s recommendation the consideration he gave it,’ expressly stated that the jury’s recommendation ‘weighted] heavily in favor of the defendant,’ and gave its reasons for overriding the jury’s recommendation, this Court finds that the circuit court satisfied the requirements set forth in Taylor and Carroll. Carroll, 852 So.2d at 836, (C.R. 26-27.) Consequently, Mitchell is not entitled to relief on this issue.”
Mitchell v. State, 84 So.3d at 992.
The trial court’s sentencing order and the record support its findings as to the jury override, as does the holding in Ex parte Carroll.
IV.
McMillan argues that the defense was erroneously prevented from adequately presenting mitigating evidence, in violation of State and federal law. He refers to the criminal record of his stepbrother, who he alleged raped him when he was a child and who was also raised by the same abusive father. Moreover, he-argues that he should have been allowed to present this evidence because his stepbrother, like McMillan, had been convicted of the capital offense of murder committed by shooting into a vehicle, and that, because the main theory of his defense at the penalty phase of his trial was the sexual, physical, and mental abuse he suffered during his childhood, this evidence was especially relevant. He also submits that because the State predominately argued that because his sisters were raised in the same household and now lead successful lives, he should have been allowed to show that his stepbrother, who was raised by the same father, did not lead a successful life.
In making his argument, McMillan relies on Ex parte Smith, [Ms. 1010627, March 14, 2003] - So.3d - (Ala.2003), to contend that he “ ‘was prevented from presenting a complete picture of the impact his dysfunctional family had on his development.’” (McMillan’s brief, at 53), quoting Ex parte Smith, - So.3d at -.
Concerning a defendant’s right to present mitigating evidence at his sentencing hearing, this Court has opined:
“ ‘The United States Supreme Court had declared that a defendant convicted of capital murder must be allowed to present at the sentencing hearing a broad range of proposed mitigating evidence. The Court held:
“ ‘ “[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or *222 record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.”
“ ‘Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnotes omitted).
“ ‘By statute, Alabama law allows a broad spectrum of evidence to be offered as mitigation:
“ ‘ “In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”
“ ‘§ 13A-5-52, Ala.Code 1975.
“ ‘Our Supreme Court has previously stated:
“ ‘ “To determine the appropriate sentence, the sentencer must engage in a ‘broad inquiry into all relevant mitigating evidence to allow an individualized determination.’ Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Alabama’s sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978). See 13A-5-45(g), Ala.Code 1975 (‘The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.’). ‘[E]vidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.’ California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring specially).”
“ ‘Ex parte Smith, [Ms. 1010267, March 14, 2003] - So.3d at -.
“‘Evidence proffered in mitigation by the defendant must be relevant, however, and the determination of relevance is a decision for the trial court to make in the sound exercise of its discretion. Knotts v. State, 686 So.2d 431, 444 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). We stated in Knotts:
“ ‘ “The determination of the relevancy of evidence lies within the sound discretion of the trial court. Borden v. State, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, McElroy’s Alabama Evidence, § 21.01(6) (4th ed. 1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant’s character or record and any circumstances pertaining to the offenses.” ’
“Beckworth v. State, 946 So.2d 490, 504-05 (Ala.Crim.App.2005).
“‘Although a defendant’s right to present proposed mitigating evidence is quite broad, evidence that is irrelevant and unrelated to a defendant’s character or record or to the circumstances of the crime is properly excluded. See Beckworth v. State, 946 So.2d at 507 (evidence that Beck-worth’s father was currently charged with sexually abusing Beckworth’s daughter was properly excluded be *223 cause it was irrelevant).’ Woods v. State, 13 So.3d 1, 33 (Ala.Crim.App.2007) (finding ‘no error, plain or otherwise, as to this claim’)
“ ‘ “ “While Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App.1989).” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996). Finally, although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. See Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).’
“Sharp v. State, [Ms. CR-05-2371, December 19, 2008] - So.3d -, - (Ala.Crim.App.2008) (opinion on return to remand).”
Johnson v. State, 120 So.3d 1130, 1153 (Ala.Crim.App.2009).
Here, McMillan was not raised by his father, so he and his stepbrother did not grow up in the same household. Moreover, his stepbrother’s upbringing was not relevant to McMillan’s character or to the present offense.
At the sentencing hearing, McMillan sought to introduce his stepbrother’s arrest record for the offense of murder by shooting into a vehicle and a record showing that his stepbrother pleaded guilty to first-degree robbery. The State responded that the arrest record did not show any conviction and that these records were not relevant to McMillan’s defense that the Department of Human Resources had failed him. Although the State acknowledged that the records did seem to address the argument concerning his sister’s successful life, there was evidence presented by the defense connecting McMillan to the stepbrother or to the environment in which the stepbrother had grown up. The prosecutor surmised that the proffered evidence was “remote, it’s tenuous, and it has nothing to do with the circumstances of this offense or the character or record of [McMillan] that he would offer as a basis for life without parole.” (R. 1644.) The trial court noted, “I haven’t heard this [stepbrother’s] name mentioned other than what he allegedly did.” (R. 1645.) It then disallowed the documents to be presented to the jury because they were immaterial and irrelevant “to the issues that the jury is called on to decide in the penalty phase with regard to Calvin McMillan.” (R. 1645.)
Here, it is unlikely that any juror would have accorded more weight to the nonstat-utory mitigating circumstances concerning McMillan’s background based on these records. They were aware of his claims that he had been sexually abused by his stepbrother. They were also aware of the difficult circumstances of his upbringing. See generally Davis v. State, 44 So.3d 1118, 1141 (Ala.Crim.App.2009) (“Evidence of a difficult childhood has been characterized as a ‘double-edged’ sword. See Bacon v. Lee, 225 F.3d 470, 481 (4th Cir.2000). ‘[E]mphasizing a client’s deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct.’ Card v. Dugger, 911 F.2d 1494, 1511 (11th Cir.1990). What one juror finds to be mitigation another juror may find aggravating. ‘[Mitigation may be in the eye of the beholder.’ ”).
Moreover, McMillan spent very little time with his father and, as stated by the *224 prosecutor, the evidence indicated that he had not been with his father over a six-year period before the charges were brought against the stepbrother. Further, it appears that the stepbrother was arrested for the capital offense, but there was no evidence that he was tried or convicted of the crime.
There was no abuse of discretion by the trial court in determining that the evidence was not relevant as mitigation.
V.
McMillan argues that the trial court erred by preventing him from thoroughly cross-examining a State’s witness. Specifically, McMillan refers to Investigator Kirk Pelham of the Millbrook Police Department, who was assigned as the case agent in the investigation of this offense.
On appeal, McMillan alleges that at trial he sought to question Investigator Pelham concerning his violation of certain police-department policies, including use of police equipment, careless handling of equipment, unauthorized use of a city vehicle, conduct unbecoming an officer, and failing to obey and execute lawful orders of supervisors.[21] McMillan argues that this was relevant as an indication that Investigator Pelham failed to maintain a proper chain of custody as to the evidence in McMillan’s case.
At trial, after McMillan entered his proffer of the evidence concerning this disciplinary report, the prosecutor responded that he did not believe that it should be allowed into evidence because the alleged incidences occurred on July 18, 2008, after his involvement in the present case. The prosecutor stated:
“If the defendant has any information showing that at any time there was a suspect or weak or even a missing link as to evidence based on his handling of it, then that would certainly be relevant. But to say that the last piece of evidence that or pieces of evidence that Detective Pelham transported in this case occurred in March of 2008. This incident occurred approximately three and a half months after that, which makes it remote from this case and it occurred after this case....
“... [I]f there had been any indication in this report that there was any evidence in this car, that it was other than personal equipment, which is radio, badge and gun, then I would say that’s a different story, but there is a huge difference between personal items that you carry with you everywhere you go and evidence which is handled specially. You take it out of the evidence locker, you take it somewhere and you turn it over, but that you keep secure. I think this is a huge difference between personal equipment and evidence.”
(R. 1235-36.)
Thereafter, the trial judge held that the defense could not inquire into the evidence surrounding the disciplinary report, finding that it was too remote in time, that it was not relevant or probative of any issues in this case, and that there had been no evidence to suggest that Investigator Pel-ham had ever done anything improper or unprofessional as an officer in dealing with evidence in a case.
“Initially we note that
“ ‘ “ ‘The scope of cross-examination in a criminal proceeding is within the discretion of the trial court, and *225 it is not renewable except for the trial judge’s prejudicial abuse of discretion. The right to a thorough and sifting cross-examination of a witness does not extend to matters that are collateral or immaterial and the trial judge is within his discretion in limiting questions which are of that nature. Collins v. State, [Ala.Crim.App., 364 So.2d 368 (1978).]’ ”
“ ‘Burton v. State, 487 So.2d 951, 956 (Ala.Crim.App.1984), quoting Coburn v. State, 424 So.2d 665, 669 (Ala.Crim.App.1982).’
“Gamble v. State, 791 So.2d 409, 434 (Ala.Crim.App.2000).”
Moore v. City of Leeds, 1 So.3d 145, 151 (Ala.Crim.App.), cert. denied, 1 So.3d 157 (Ala.2008).
“Before evidence may be considered by a jury, it must fulfill certain minimum requirements of admissibility, including that of relevancy. ‘Evidence which is relevant has some tendency to make the existence of any fact or inference that is of consequence to the determination of the action more or less probable than it would be without the evidence.’ Dawkins v. State, 455 So.2d 220, 221 (Ala.Cr.App.1984).
“In Dennard v. State, 405 So.2d 408, 410 (Ala.Cr.App.1981), we held:
“ ‘Evidence, to be competent and admissible, must be relevant. This is to say, evidence must tend to prove or disprove the issues before the jury. The determination of the relevancy or lack of relevancy of particular evidence rests largely in the sound discretion of the trial judge. It is, therefore, the duty of the trial judge to limit the evidence to the points in issue so that the attention of the jury is not distracted, nor withdrawn from the primary issues, to be directed towards foreign matters or issues of questionable or doubtful relevancy.’
“The court may exclude evidence when it is such as to furnish a basis for nothing more than mere conjecture or remote inferences in reference to the transaction under investigation. Trawick v. State, 431 So.2d 574, 578 (Ala.Cr.App.1983).”
Hawkins v. State, 549 So.2d 552, 557 (Ala.Crim.App.1989).
Here, the trial court did not abuse its discretion in determining that any report indicating that the case officer had been cited for misusing city property that was not related to this case, which citation had occurred after his involvement in this case, was not relevant. Additionally, McMillan has presented no evidence that the investigator mishandled any evidence in the present case.
Moreover, although McMillan contends that he should have been allowed to cross-examine Investigator Pelham concerning the disciplinary reports in order to impeach him, this argument is too tenuous to be meritorious. He argues that Investigator Pelham “had an ‘interest’ in providing testimony that he followed police procedures in this case, thereby protecting his career and professional reputation.” (McMillan’s brief, at 60.)
“ ‘In the discharge of its fact finding functions the jury’s search for the truth includes the paramount right to consider a witness’s motivation, and any evidence testing “his interest, bias or prejudice” so as to “illustrate or impeach the accuracy of his testimony” is a competent, material and relevant subject of cross-examination, and the jury’s right to be given such evidence is, of itself, part of the fact finding process. Green v. State, [258 Ala. 471, 64 So.2d 84 (1953) ].’
*226 “Ex parte Brooks, 393 So.2d 486, 487-88 (Ala.1980).”
Gobble v. State, 104 So.3d at 953.
However, a witness may not be unduly harassed and interrogated concerning a matter that does not indicate bias in the particular case under the guise of impeachment.[22]
“ ‘ “Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.... A more particular attack on the witness’ credibility is effected by means of cross-examination directed towards revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand....’””
Ex parte Lynn, 477 So.2d 1385, 1386 (Ala.1985) (quoting other cases). See also Newsome v. State, 570 So.2d 703, 714 (Ala.Crim.App.1989) (“The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating. Atwell v. State, 354 So.2d 30 (Ala.Cr.App.1977), cert. denied, 354 So.2d 39 (Ala.1978).”).
Here, any disciplinary concerning the investigator’s use of city property following his role in the investigation of this offense would not have indicated bias or effected his credibility so that it would not have constituted valid impeachment evidence.
VI.
McMillan argues that the trial court erred in admitting prejudicial victim-impact evidence during the guilt phase of the trial. McMillan refers to a photograph of the victim and his wife on their wedding day that the State introduced as proof of life of the victim. He argues that this wedding photograph should not have been admitted during the guilt phase of the trial because it was irrelevant, injected personal and inflammatory considerations into the trial, and undermined the reliability of the verdict.
Because McMillan failed to raise this argument at the trial court level, this matter is to be examined pursuant to the plain-error rule. See Rule 45A, Ala. R.App.P.
“In Jolly [v. State, 395 So.2d 1135 (Ala.Crim.App.1981) ], citing McElroy’s Alabama Evidence, this court held:
“ ‘ “It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim’s photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the deceased, (citing Luschen v. State, 51 Ala.App. 255, 284 So.2d 282 (1973) (not error to *227 introduce ‘angelic’ looking picture of deceased); Boyd v. State, 50 Ala.App. 394, 279 So.2d 565 (1973); Sanders v. State, 202 [Ala.App.] 37, 202 Ala. 37, 79 So. 375 (1918)).” ’
“395 So.2d at 1142.”
Burgess v. State, 827 So.2d 134, 187 (Ala.Crim.App.1998), affirmed, 827 So.2d 193 (Ala.2000), cert. denied, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed.2d 335 (2002). See Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994) (finding no plain error in the admission during the guilt phase of a photograph of the victims in front of a Christmas tree). See also Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000) (finding no plain error in admission during the guilt phase of the victims in front of their boat because it was relevant to show, among other things, that they were alive before the offense).
There was no plain error in the present case resulting from the admission into evidence of the wedding photograph and the identification by his widow of the victim in the photograph.
VII.
McMillan contends that the trial court erred by refusing to grant a continuance for the defense to conduct an adequate investigation into mitigation. McMillan refers to the trial court’s denial of his second motion for a continuance in order to obtain a reliable mitigation expert. He asserts that his mitigation expert suffered from a neurological condition and therefore she was unable to conduct her investigation, and therefore he requested a continuance three weeks before the date set for trial.[23] The trial court granted him a continuance for a month. However, he argues, the expert’s medical condition persisted, and he requested another continuance, which was also denied. Therefore, he was forced to obtain a mitigation expert with no experience.
The record indicates that in February 2009, five months after McMillan requested and was granted funds to hire a mitigation specialist, he hired Dr. Kimberly Ack-erson. On April 20, 2009, he made his first motion to continue based on her medical condition. The trial court granted his motion for a month and reset the trial for June 22, 2009.
McMillan filed another motion to continue on May 15, 2009, indicating that he had been attempting to find another mitigation expert to replace Dr. Ackerson and had spoken to at least seven specialists who had indicated that it would take at least eight months to prepare for trial.
On May 18, 2009, McMillan filed a motion asking the trial court to appoint another mitigation expert, stating that his “initial mitigation specialist has a medical condition that could prevent her from testifying on the trial date, and has already caused the initial date to be continued.” (C.R. 442.) The motion also stated that “Defense Counsel has interviewed the proposed social worker, G. Teal Dick, and believes that he is qualified to provide mitigation services for the Defendant. He has indicated that he is willing to undergo the task as a mitigation specialist.” (C.R. 423.) He attached a copy of Dick’s resumé to the motion, including his qualifications and history of working with the courts, the Department of Human Resources (“DHR”), Hillcrest Behavioral Health Hospital, and the community. (C.R. 434.)
*228 On May 21, the trial court entered an order denying the motion for a continuance and another order granting the motion to appoint Dick as the mitigation specialist and granting the defense additional funds if necessary. (C.R. 437, 438.)
The record further reveals that Dr. Ack-erson testified as to mitigating evidence during the penalty phase of trial. Dick also testified as to mitigation at the penalty phase.
“ ‘ “ ‘A motion for a continuance is addressed to the discretion of the court and the court’s ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).’ ”
“ ‘Fortenberry v. State, 545 So.2d 129, 138 (Ala.Crim.App.1988).’
“Ex parte Clark, 728 So.2d 1126, 1134 (Ala.1998) (quoting Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986)). See also Scott v. State, 937 So.2d 1065, 1076 (Ala.Crim.App.2005).
[[Image here]]
“< reVersal of a conviction because of the refusal of the trial judge to grant a continuance requires ‘a positive demonstration of abuse of judicial discretion.’ Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).” Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala.1979).’
“McGlown v. State, 598 So.2d 1027, 1029 (Ala.Crim.App.1992).”
Eatmon v. State, 992 So.2d 64, 68 (Ala.Crim.App.2007), cert. denied, Eatmon v. Alabama, 555 U.S. 876, 129 S.Ct. 185, 172 L.Ed.2d 132 (2008).
Because McMillan was granted the appointment of a second mitigation specialist and his initial witness, Dr. Ackerson, was able to testify extensively at trial, he was not prejudiced by the denial of his second motion for a continuance, which requested time “until the Defendant can find an experienced mitigation specialist to replace Dr. Kimberly Ackerson.” (C.R. 435.) Thus, the trial court did not abuse its discretion in denying the second motion for a continuance, and its decision was not an unreasonable insistence on expeditiousness.
VIII.
McMillan argues that the trial court erred by requiring him to wear an electronic stun belt during trial. The record indicated that McMillan failed to object to this issue at trial. Therefore, this matter is due to be evaluated pursuant to the plain-error rule. See Rule 45A, Ala. R-App.P.
This Court has previously held that there was no plain error in requiring a defendant to wear a stun belt, relying on Scieszka v. State, 259 Ga.App. 486, 578 S.E.2d 149 (2003).
“ ‘Our Supreme Court has held that the use “of a remedial electronic security measure” is permissible where it is shielded from the jury’s view and where there is no evidence that defendant was harmed by its use. Young v. State, 269 Ga. 478, 479(2), 499 *229 S.E.2d 60 (1998). In the Young case, the court found that there was nothing in the record to show that the use of such an electronic device was “so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial” (Citation and punctuation omitted.) Id. In another case, the Supreme Court rejected the defendant’s argument regarding the use of a stun belt, finding that there was “nothing in the record to support [the defendant’s] contention that the device [(although not visible to the jury)] nonetheless had a detrimental psychological effect on his ability to participate in the trial.” Brown v. State, 268 Ga. 354, 359-860(7), 490 S.E.2d 75 (1997). And in Stanford v. State, 272 Ga. 267, 271(8), 528 S.E.2d 246 (2000), the court again found no merit to the defendant’s arguments regarding the use of an electronic security device because he failed to object to the device and because it was not visible to the jury.
“ ‘Scieszka’s argument must similarly fail because he raised no objection to the use of the stun belt and thus did not obtain a ruling from the trial court on the issue. Moreover, the record is devoid of any evidence of harm or prejudice arising from the use of the stun belt at his trial.
“ ‘And contrary to Scieszka’s assertion, the recent opinion by the Eleventh Circuit Court of Appeals in United States v. Durham, 287 F.3d 1297 (11th Cir.2002), does not require a different result. In Durham, the Eleventh Circuit expressed serious concerns regarding the use of these devices and their effect on a defendant’s ability to participate in his defense. Id. at 1305-1306. Nevertheless, the defendant in that case had filed a motion seeking to prohibit the stun belt’s use, and the district court had ruled that the device could be used in light of the defendant’s history of escape attempts. Id. at 1302-1303. The Eleventh Circuit remanded the ease, requiring the district court to make factual findings regarding the use of the stun belt and to consider on the record the use of less restrictive alternatives. Id. at 1307-1309. Thus Durham is distinguishable from this case because the use of the stun belt in that case was court-sanctioned following the defendant’s objection.’
“259 Ga.App. at 487-88, 578 S.E.2d at 150-51.”
Belisle v. State, 11 So.3d 256, 282 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert. denied, 557 U.S. 939, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009).
Here, there was no indication of error as a result of the use of the stun belt.
IX.
McMillan argues that the trial court committed reversible error by admitting what he says were prejudicial photographs that served no purpose except to inflame the passions of the jury. McMillan refers to photographs developed from a disposable camera[24] that was found in the victim’s truck when it was processed by the police. He specifically refers to a photograph of a gun on a pile of money, two photographs of him making gestures toward the camera, and a photograph of him posed pointing a gun toward the camera.
*230 McMillan argues that the photographs should not have been allowed into evidence because, he says, the State failed to lay the proper predicate • for their admission by proving who took the photographs or when they were taken. He also argues that they were inadmissible because they were evidence of prior bad acts offered to prove his bad character and were overly prejudicial.
A.
McMillan contends that the State failed to lay the proper predicate for the admission of the photographs because there was no evidence as to who took the photographs or when they were taken. He alleges that the prosecutor’s argument at trial that the photographs should be admitted pursuant to the “silent witness” theory has never been applied in Alabama “to images where the defendant is alleged to have taken the photographs.” (McMillan’s brief, at 73.)
At trial, evidence showed that the disposable cameras were found in the victim’s truck. One was located in the passenger compartment and the other was found in a bag behind the seat. (R. 210-11, 1198.) The bag was found within a Fila brand bag that contained McMillan’s belongings. (R. 206.) After the truck was processed and inventoried, the cameras were turned over to Investigator Pelham. (R. 1035-36.) The cameras were taken for processing to a Rite Aid drug store. The employee who had developed the film in the cameras testified that she did so in the normal course of business, that she had been trained to do so, and that all the equipment was working properly. (R. 1104-06.) The officer, Investigator Pelham, who brought the cameras into the Rite Aid drug store remained while the film was processed. (R. 1106.) He testified that he watched the process of the development and that he made copies of the photographs. (R. 1199.) He further testified that he did not alter or tamper with the evidence and that the photographs were placed in evidence bags and then put into the evidence locker. He identified them in court as being the same as when they were developed and received at the Rite Aid drug store. (R. 1201.)
At trial, a witness who had seen McMillan when he came by the witness’s apartment on the night following the offense testified that he had known McMillan through his son. He stated that McMillan came by his apartment in order to show his new truck to the brother of the witness’s god-parent. The State showed the four photographs to the witness, and he identified McMillan, the man he had seen that night, as the man in the photographs. The photographs were also shown to Ron-darrell Williams for identification purposes. (R. 1090-91.)
As to the photographs of the gun,[25] Investigator Pelham testified that the photographs of the gun depicted an automatic weapon and that the photograph depicting the gun lying on the pillow or bedding revealed three round holes in the trigger. (R. 1210-11.)
The photographs were properly allowed into evidence. The photographs of McMillan were authenticated by two witnesses who authenticated that the photographs showed McMillan as he appeared at the time of the offense. Thus, the “silent witness” theory was not necessary for their admission. See Ex parte Rieber, 663 So.2d *231 999, 1008 (Ala.1995) (“ ‘If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the “silent witness” foundation must be laid.’ ”).
Moreover, had the witnesses not testified that this was McMillan’s appearance at the time of the offense, the “silent witness” theory would have allowed the photographs of McMillan to be admitted pursuant to the testimony of the Rite Aid drug-store employee.
The photographs of the gun were also admissible pursuant to the “silent witness” theory based on the testimony of the Rite Aid employee.
“ ‘There are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the “pictorial communication” or “pictorial testimony” theory and the “silent witness” theory. [2 John W. Strong, James H. Chadbourn,] Wigmore [on Evidence, § 790 (1970 & Supp.1991) ]; McCormick [on Evidence § 214 (1992) ]; and [William A. Schroeder, et al., Alabama Evidence, § 11-3 (1987 & Supp. 1988) ]. The “pictorial communication” theory is that a photograph, etc., is merely a graphic portrayal or static expression of what a qualified and competent witness sensed at the time in question. Wigmore, supra, § 790, and McCormick, supra, § 214. The “silent witness” theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness’s senses, and because the process or mechanism is explained before the photograph, etc., is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the photograph, etc., records. Wigmore, supra, § 790, and McCormick, supra, § 214.
“ ‘A reasonable reading of [Voudrie v. State, 387 So.2d 248 (Ala.Crim.App.1980), cert. denied, 387 So.2d 256 (Ala.1980); Carraway v. State, 583 So.2d 993 (Ala.Crim.App.1991), cert. denied, 583 So.2d 997 (Ala.1991); Molina v. State, 533 So.2d 701 (Ala.Crim.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989),] and the more recent caselaw of the Court of Criminal Appeals leads us to conclude that the Court of Criminal Appeals is of the opinion that the “pictorial communication” and “silent witness” theories are mutually exclusive theories, rather than alternative theories. The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the “silent witness” foundation must be laid. Under the “silent witness” theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability.’ ”
Ex parte Rieber, 663 So.2d at 1008, cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
The “silent witness” theory allows the admission of photographs under certain conditions according to the procedures, *232 safeguards of the processing, and proof thereof that is presented at trial.
“ ‘The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the “silent witness” foundation must be laid. Under the “silent witness” theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the “silent witness” theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudrie standard requires:
“‘(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
“‘(2) a showing that the operator of the device or process or mechanism was competent,
“ ‘(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“ ‘(4) a showing that no changes, additions, or deletions have been made,
“ ‘(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“ ‘(6) identification of the speakers, or persons pictured, and
“ ‘(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.’
“Ex parte Fuller, 620 So.2d 675, 678 (Ala.1993).”
Baker v. State, 87 So.3d 587, 596 (Ala.Crim.App.2009).[26]
In the present case, the State presented a sufficient precedent or foundation to allow the photographs into evidence.
B.
The photographs were admissible because they were relevant and probative to the case, despite McMillan’s claim that they should have been precluded under Rule 404(b), Ala.R.Evid.
“1 “ ‘Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” ’
“ ‘Gaddy v. State, 698 So.2d 1100, 1148 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)). Furthermore, photographs that depict *233 the crime scene are relevant and therefore admissible. Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Finally, photographs may be admissible even if they are cumulative or demonstrate undisputed facts. Stanton v. State, 648 So.2d 638 (Ala.Cr.App.1994); Hopkins v. State, 429 So.2d 1146, 1157 (Ala.Cr.App.1983).’
“Hyde v. State, 778 So.2d 199, 234-35 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).”
Newton v. State, 78 So.3d 458, 474 (Ala.Crim.App.2009). See also Holder v. State, 584 So.2d 872, 881 (Ala.Crim.App.1991) (“Generally, whether to admit photographic evidence is left to the sound discretion of the trial court and its decision will be reversed only when an abuse of discretion has occurred. See Bankhead [v. State, 585 So.2d 97 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), affirmed on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), reversed on other grounds, 625 So.2d 1146 (1993) ]; Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (198[6])”).
In the present case, McMillan gave a statement indicating that another man gave him a ride in the victim’s truck and that it was that man who jumped from the truck and tried to escape when the police attempted to apprehend the person who had shot the victims. McMillan also called the eyewitnesses’ descriptions of the perpetrator into question. Therefore, the question of the perpetrator’s appearance became relevant.
“Rule 401, Ala. R. Evid., provides:
“ ‘ “Relevant evidence” means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.’
“Rule 402, Ala. R. Evid., provides:
“ ‘All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.’
“Rule 403, Ala. R. Evid., provides:
“ ‘Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.’
“Finally, Rule 404(b), Ala. R. Evid., provides:
“ ‘Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any *234 such evidence it intends to introduce at trial.’
“This court addressed the admissibility of evidence about collateral bad acts in Irvin v. State, 940 So.2d 381, 344-46 (Ala.Crim.App.2005), as follows:
“ ‘ “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, “ ‘[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.’ ” Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).’ ”
Baker v. State, 87 So.3d at 598.
In this case, the photographs of McMillan were relevant because he challenged the descriptions given by a number of State’s witnesses’ descriptions of the perpetrator of the offense as having differed from his appearance; one of them as to the length of his hair.[27] Other State’s witnesses who knew McMillan described him as having closely cropped hair and a goatee. (R. 1084, 1090-91.) At the time of trial, McMillan had changed his appearance and had no goatee. Thus, McMillan brought his appearance into issue at trial and opened the door for the admission of photographic evidence by the State to prove that Rondarrell Williams and the witness who saw McMillan on the night following the offense were accurate as to them descriptions. See Hardy v. State, 804 So.2d 247, 271 (Ala.Crim.App.1999), affirmed, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001) (“ ‘Similarly, factors such as the witness’s familiarity with the defendant’s appearance at the time the surveillance photographs were taken or dressed in a manner similar to the individual depicted in the photographs, and whether the defendant had either disguised his appearance at the time of the offense or altered his appearance prior to trial, would also have some bearing on whether the witness is better able than the jury to make a correct identification. See United States v. Ellis, 121 F.3d 908, 926 (4th Cir.1997), cert. denied, 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 674 (1998) (upholding the admission of lay opinion identification testimony by a witness who had known defendant for approximately five years, where defendant had disguised himself with a mask and a hooded sweatshirt at the time of the offense); [United States v.] Towns, 913 F.2d [434] at 445 [(7th Cir.1990) ] (upholding identification testimony from defendant’s former girlfriend, who had observed defendant’s appearance on the day of the bank robbery, where the surveillance photograph depicted the robber “wearing a stocking cap, sunglasses, and a sweatsuit that potentially made him appear heavier than he really was” and where defendant had shaved his mous-tache off prior to trial); [United States v.] Borrelli, 621 F.2d [1092] at 1095 [(10th Cir.1980) ] (finding lay opinion identifiea *235 tion testimony helpful where witness, defendant’s stepfather, “had independent knowledge of [defendant’s] appearance both before and at the time of the robbery” and defendant “had significantly altered his appearance by changing his hairstyle and growing a moustache”)’ ”).
Moreover, the photograph of McMillan pointing the gun proved that he had possession or access to a gun similar to the murder weapon. The other photographs of the gun from the same roll of film containing the photographs of McMillan also connect him to the weapon. Because no fingerprint evidence was found on the murder weapon, this photographic evidence was particularly important to the State’s case. Thus, this evidence “ ‘ “ ‘had some logical connection’ ” ’ ” to the murder and tended to corroborate Rondarrell Williams’s statement that McMillan possessed a 9mm or 40-caliber automatic. (R. 1048, 1063, 1089-90.) Mitchell v. State, 84 So.3d 968, 1010 (Ala.Crim.App.2010). See also Brown v. State, 56 So.3d 729 (Ala.Crim.App.2009) (“Although the State could not directly connect the caliber of bullets and the bullet casings found at Brown’s house with the fragments found in the victim’s body, the bullets and bullet casings were of the same caliber as the gun Brown told police Martin used to kill Laney and subsequently asked Brown to throw off of the bridge. Given the liberal test applied to determine the relevancy of evidence, the caliber of the bullets and bullet casings found at Brown’s house, and the type of gun Brown threw over the bridge, we cannot say that the circuit court abused its discretion by allowing the bullets and bullet casings into evidence at trial.”).
Although the photographs of the gun were not directly identified as depicting the murder weapon, the weight and credibility of the evidence were matters for the jury’s determination. Investigator Pelham testified that the photographs of the gun depicted an automatic weapon, and that the photograph depicting the gun lying on the pillow or bedding revealed three round holes in the trigger. (R. 1210-11.) The defense introduced evidence of photographs from various pawn shops to prove that a number of similar guns have three holes in the trigger.
Adam Grooms, the forensics expert who specialized in firearms and tool marks, testified concerning the gun that was found in the victim’s truck. He identified it as the weapon that had discharged the bullets (that killed the victim) in this offense. He was not shown the photographs for identification or comparison. Although the prosecutor referred to a defect or scratch on the trigger guard of the gun that he argued was also apparent in the photograph of McMillan pointing the gun at the camera, neither Investigator Pelham nor Adam Grooms testified concerning the scratch. However, the gun and the photographs of the gun were relevant and could be evaluated and considered by the jury.
“ ‘ “[T]he State is not permitted to give in evidence other crimes alleged to have been committed by the defendant unless they are so connected by circumstances with the particular crime charged as that proof of one fact with its circumstances has some bearing on the issue on trial other than to show in the defendant a tendency or disposition to commit the crime with which he is charged.” ’
“Ex parte Casey, 889 So.2d 615, 618 (Ala.2004) (quoting Garner v. State, 269 Ala. 531, 533, 114 So.2d 385, 386 (1959) (emphasis omitted)).’
Ex parte Deardorff, 6 So.3d 1235, 1242 (Ala.2008).
*236 Here, the photographs of McMillan were relevant to the issue of identity and the photographs of the gun were admissible to connect McMillan to the murder weapon.
C.
The probative value of the photographs outweighed their prejudicial impact.
“ ““ “Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’” Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra [557 F.2d 464,] at 468-69 [(5th Cir.1977) ]. ‘ “ ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” [Citation omitted.] “Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be grounds for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ ” ’ Averette v. State, supra, at 1374.”
“ ‘[Robinson v. State,] 528 So.2d [343,] 347 [ (Ala.Crim.App.1986) ]. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim.App.2002).’ ”
Baker v. State, 87 So.3d at 599.
Although the probative value of the photograph of the gun lying on a pile of money is questionable as opposed to its prejudicial impact in light of the other photographs available of the gun and because no money was taken in this offense, the error, if any, in its admission on the basis that its probative value outweighed its prejudicial effect was harmless. See Rule 45, Ala. R.App.P. (“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”).
“The Alabama Supreme Court has stated:
“ ‘ “[Bjefore the reviewing court can affirm a judgment based upon the ‘harmless error’ rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis omitted). “ ‘The basis for the [exclusionary rule] lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irrevers *237 ible impact upon the minds of jurors.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983), quoting C. Gamble, McElroy’s Alabama Evidence, § 69.01(1) (3d ed. 1977), also quoted in Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995).’
“Ex parte Casey, 889 So.2d 615, 621-22 (Ala.2004).”
Turner v. State, 929 So.2d 1041, 1043 (Ala.Crim.App.2005).
Here, the presence of the money did not prove or indicate a prior offense or a collateral bad act by McMillan so that the admission of the photograph might have effected one of McMillan’s substantial rights. Moreover, in light of the overwhelming evidence against McMillan, it is clear that the jury’s decision was based on the evidence of guilt rather than any prejudice from the fact that the gun was positioned atop a pile of money in the photograph. Johnson v. State, 120 So.3d 1130, 1187 (Ala.Crim.App.2009). Brown v. State, 74 So.3d 984, 1013 (Ala.Crim.App.2010) (“[T]he evidence as to Brown’s guilt was overwhelming. After reviewing the entire record as a whole, ‘it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty’ even without the admission of Washington’s statement to Mobbs. United States v. Hasting, 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under these circumstances, any error in the admission of Washington’s statement to Mobbs was harmless. See Rule 45, Ala.R.App.P.”).
“ ‘ “ ‘After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was.’ Guthrie v. State, 616 So.2d 914, 931 (Ala.Crim.App.1993), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). ‘The harmless error rule applies in capital cases.’ Knotts v. State, 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). ‘In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant’s substantial rights.’ Coral v. State, 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). ‘The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’ Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
‘“McNabb v. State, 887 So.2d 929, 976-77 (Ala.Crim.App.2001).’
“Sale v. State, 8 So.3d 330, 347 (Ala.Crim.App.2008). See also Ex parte Brown, 11 So.3d 933 (Ala.2008) (holding that the alleged improper admission of evidence in a capital trial was harmless); Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997) (holding that the im *238 proper admission of the defendant’s coerced confession was harmless in light of the overwhelming evidence establishing that the defendant committed the capital offense).”
Ex parte Brownfield, 44 So.3d 43, 48 (Ala.2009).
In the present case, the photographs were relevant and properly admitted. Moreover, the probative value of the photographs was not outweighed by their prejudicial effect. The photograph showing the gun atop the pile of money was properly admitted; any error was, at most, harmless.
X.
McMillan argues that prosecutorial misconduct undermined the reliability of the death sentence. He cites three instances in which he. alleges that the prosecutor engaged in impropriety.
A.
McMillan alleges that the prosecutor improperly introduced victim-impact evidence by eliciting testimony from the victim’s father during the penalty phase that indicated a comparison between the fact that the victim’s mother had left his family when the victim was a child, as had McMillan’s mother. McMillan argues that this testimony served only to point out harm caused to the victim’s family by the offense. McMillan also alleges that the prosecutor emphasized this impropriety by diminishing the hardships of McMillan’s childhood by stating that he was not the only child who had been a “victim” of a dysfunctional family and that others had not grown “up to be sociopathic killers.” (R. 1520-21.)
“In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held: “‘[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. “[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.” Booth [v. Maryland ], 482 U.S. [496, 517 (1987) ] (White, J„ dissenting) (citation omitted). By turning the 'victim into a “faceless stranger at the penalty phase of a capital trial,” [South Carolina v.] Gathers, 490 U.S. [805, 821 (1989)] (O’Connor, dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.’
“501 U.S. at 825, 111 S.Ct. 2597. The Supreme Court further stated:
“ ‘We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecuto-rial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.’
“Payne, 501 U.S. at 827, 111 S.Ct. 2597. The Supreme Court recognized that vie- *239 tim-impact evidence ‘is designed to show instead each victim’s “uniqueness as an individual human being,” whatever the jury might think the loss to the community resulting from his death might be.’ Payne, 501 U.S. at 823, 111 S.Ct. 2597.”
Woods v. State, 13 So.3d 1, 35 (Ala.Crim.App.2007).
There was no impropriety in comparing the abandonment by the victim’s mother with that of McMillan or in comparing McMillan with other child victims who did not grow up to be criminals. These arguments were used to rebut McMillan’s mitigating evidence concerning the hardships of his childhood. See Woods v. State, 13 So.3d 1 (Ala.Crim.App.2007) (testimony from victim’s family as to the harm to the children, grandchildren, and planned children caused by the victim’s loss was proper rebuttal testimony for the mitigating evidence offered by Woods, i.e., that he was the father of three children whom he loved). See also Ferguson v. State, 814 So.2d 925, 949 (Ala.Crim.App.2000), affirmed, 814 So.2d 970. (Ma.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002) (prosecutor’s argument that the victims also did not have a chance was proper rebuttal to the mitigating evidence that Ferguson did not have a chance because of his difficult childhood and his low intelligence).
“Obviously, a prosecutor is permitted to argue to the trial court (or to the jury) that it should not find evidence offered by a defendant to be mitigating. Moreover, ‘[a] prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel.’ DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).”
Ferguson v. State, 814 So.2d at 949.
There was no impropriety by the prosecutor as to his argument at the penalty phase on this ground.
B.
McMillan contends that the prosecutor engaged in improper conduct by telling the jury that the district attorney’s office, the police, and the victim’s family had already decided that death was the appropriate sentence. McMillan refers to the following argument by the prosecutor during his closing at the guilt phase:
“Now, ladies and gentlemen, several months ago my office decided that this case justified our seeking the death penalty. The family agreed with us, as did law enforcement, but none of that means anything. It doesn’t matter what my office wants to do. It doesn’t matter what I want to do. It doesn’t matter what the family wants to do. The only thing that matters is what the 12 of you decide. The 12 of you will represent the conscience and convictions of Elmore County. Only you can decide what is true and just.”
(R. 690-91.)
However, this argument by the State in favor of the death penalty was properly waged, as a prosecutor is allowed to do in a capital case. Moreover, it ultimately served as a reminder to the jury members of their duty in making the decision as to the sentencing recommendation. As this Court stated in Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009):
“In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State, 820 So.2d 113, 143 (Ma.Crim.App.1999). On the other hand, it is impermissible for a prosecutor to urge the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined *240 that death is the appropriate sentence. See Guthrie, 616 So.2d at 931-32 (holding that a prosecutor’s statement that 1 “[w]hen I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a death penalty case, and we still stand on that position” ’ improperly ‘[led] the jury to believe that the whole governmental establishment had already determined that the sentence should be death and [invited] the jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own.’)
“When the prosecutor’s comments are viewed in context, it is clear that he was properly arguing in favor of a sentence of death and properly reminding the jury of the gravity of its penalty-phase role. For instance, in stating that, ‘if this case does not call for the death penalty, what does,’ the prosecutor was properly arguing that a death sentence is appropriate and appealing to the jury to do justice. See Hall, 820 So.2d at 143. Also, the prosecutor’s comment that his office does not seek a death sentence lightly was not an improper request for the jury to ignore its penalty-phase duty. Instead, this comment merely reminded the jury of the gravity of its penalty-phase decision by informing the jury that in making its penalty phase decision it has an awesome responsibility — one that the State does not lightly ask a jury to shoulder. Cf. Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir.2000) (holding that a ‘prosecutor[’s] [comment to] the jury that he did not undertake the decision to seek the death penalty lightly, and pointed to the different elements that went into making his decision[, was] a permissible line of commentary’).
“Because the prosecutor’s comments did not urge the jury to ignore its penalty-phase role, Vanpelt has not established that these comments were improper or that they so infected the trial with unfairness that Vanpelt was denied due process. See Darden v. Wainmight, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
Vanpelt v. State, 74 So.3d at 91-92.
There was no error by the prosecutor in this argument.
C.
The prosecutor did not improperly vouch for the truthfulness of the testimony of State’s witness, Rondarrell Williams, who was McMillan’s accomplice. McMillan argues that the prosecutor vouched for Williams’s testimony by referring to the testimony as “truthful,” “honest,” and “candid.”
The prosecutor stated the following during his closing at the sentencing phase:
“Now, a lot has been said about his [Williams’s] plea deal. And I hope we made it clear, he’s got no agreement with the State. He’s throwing himself on the mercy of the Court based on truthful, honest, candid testimony.”
(R. 1391-92.)
This statement by the prosecutor addressed the terms of Williams’s agreement to testify for the State in the present case. Defense counsel had questioned Williams concerning both his arrangement with the State and the fact that he was being charged with a lesser offense. Defense counsel also questioned Williams as to the credibility of his testimony, asking, “And you feel like the better you testify, the better the deal is going to be for you, don’t you?” (R. 1084.) The State could properly refute the defense’s argument.
*241 In Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, 557 U.S. 938, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009), this Court found that a prosecutor’s argument that Brown had not been offered a deal by the State was proper because it was made in response to the defense’s argument in its closing. This Court opined:
“Part of the prosecutor’s comment was in response to the comments of defense counsel in its closing argument. ‘ “When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.” ’ Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting Defoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83)).
“ ‘ “In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).” ’
“Barber v. State, 952 So.2d 393, 437-38 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1306, 127 S.Ct. 1875, 167 L.Ed.2d 366 (2007), quoting Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989).”
Brown v. State, 11 So.3d at 909.
Here, the prosecutor was not vouching for the witness’s credibility; rather the complained-of comments concerned the witness’s reasons for and the conditions of his trial testimony. This was proper rebuttal argument by the prosecutor.
D.
In his final paragraph as to this issue in his brief on appeal, McMillan seems to argue that the prosecutor’s improper arguments and conduct so infected his trial that he was denied his rights to due process. Without citing to any specific instance, he seems to argue cumulative error.
However, a review of the record negates this contention. “ ‘ “Because we find no error in the specific instances alleged by the appellant, we find no cumulative error.” Lane v. State, 673 So.2d 825 (Ala.Crim.App.1995) See also McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000)[, reversed on other grounds, Ex parte McGriff, 908 So.2d 1024 (Ala.2004) ].’ Calhoun v. State, 932 So.2d 923, 974 (Ala.Crim.App.2005).” Hyde v. State, 13 So.3d 997, 1021-22 (Ala.Crim.App.2007), cert. denied, 558 U.S. 949, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009).
XI.
McMillan argues that the trial court erred in failing to order a change of venue because of the what he refers to as extensive and prejudicial pretrial publicity. McMillan refers to the amount of coverage by the local newspapers, as well as the television news accounts, and particularly he refers to the retaliatory and condemning comments made on certain Internet *242 blogs. He contends that the media coverage of the crime was prejudicial and inflammatory and that the community was saturated by this coverage.
The record indicates that the trial court asked the veniremembers if anyone had been made aware of the case through the media or any talk with family or friends. Forty-three members indicated that they had been exposed to media coverage or to talk concerning the case. Each of these potential jurors was subsequently questioned individually concerning this exposure and whether it might effect the juror’s ability to fairly and impartially serve as a juror. Three potential jurors, Numbers 67, 94, and 156, indicated that they might have difficulty laying aside what they had already heard about the case, and each of these veniremembers was removed for cause. Each remaining potential juror questioned concerning pretrial publicity indicated that he or she could base his or her decision strictly on the evidence presented at trial rather than what he or she had heard.[28]
Thereafter, defense counsel made a motion for change of venue, and the following transpired:
“[Defense counsel]: ... When the Court asked specific questions regarding jurors that had knowledge of this case based on media, newspapers, television, radio, things of that nature, there were a number of folks that answered, maybe as many as 20 and/or 30. We would say that the jury has been tainted by media coverage and renew our motion for a change of venue.
“THE COURT: All right. The Court did individual voir dire on all potential jurors that indicated that they had read, heard or seen anything with regard to this case. The Court considered each response individually as we did those further questions yesterday. The Court has already excused for cause those jurors that indicated that, for whatever reason expressed on the record, they cannot be fair and impartial. The Court is satisfied as to the responses of the jurors with regard to pretrial publicity issues and the motion is therefore denied.”
(R. 643-44.)
“ ‘The standard we use when evaluating whether a trial court has erred in denying a motion for a change of venue was addressed by the Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). The Court stated:
“ ‘ “Absent a showing of abuse of discretion, a trial court’s ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim. App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. *243 717, 728, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
“ ‘ “ ‘To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....’
“ ‘ “The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, ‘[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’ Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).”
“ ‘ “ ‘The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.’ Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App.1992).” Wilson v. State, 777 So.2d 856, 924 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001). Moreover, we must consider the length of time between the alleged pretrial publicity and the trial. Wilson. “When requesting a change of venue, ‘the burden of proof is on the defendant to “show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” ’ ” Jackson v. State, 791 So.2d 979, 995 (Ala.Crim.App.2000), cert. denied, 791 So.2d 1043 (Ala.2000), quoting Hardy v. State, 804 So.2d 247, 293 (Ala.Crim.App.1999). Whether to grant a motion for a change of venue is addressed to the sound discretion of the trial court. Acklin v. State, 790 So.2d 975 (Ala.Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). The trial court is in a better position than is an appellate court to rule on such a motion. The trial court was present in the community at the time of the alleged pretrial publicity and knows the specifics of the history of the case in the community. We will not reverse a trial court’s ruling on a motion for a change of venue unless a clear abuse of discretion is shown. Acklin.’ ”
Phillips v. State, 65 So.3d 971, 1010 (Ala.Crim.App.2010), quoting Stallworth v. State, 868 So.2d 1128, 1141-43 (Ala.Crim.App.2001).
Here, there was no showing, through the voir dire examination, of actual prejudice, nor was there any showing that the community was so saturated with pretrial publicity that McMillan was prevented from receiving a fair trial. Despite McMillan’s reference to certain unflattering comments made on blogs on certain Web sites, this alone did not require a change of venue. See United States v. Happ (No. CR2-06-129(8), November 25, 2008) (S.D. Ohio 2008) (not reported in F.Supp.2d) (“the presence of a web blog containing negative articles regarding Happ does not require a change of venue *244 to another district. The coverage on that blog has not created an inflammatory, circus-like atmosphere in the court-house and the Columbus jury pool. Foley [v. Parker], 488 F.3d [377] at 387 [(6th Cir.2007) ]. Furthermore, web based coverage is not localized and has an equal potential to taint a jury pool in any district.”). Gotbaum v. City of Phoenix, 617 F.Supp.2d 878, 881-82 (D.Ariz.2008) (“To be sure, some of the blog statements are disturbingly malicious. The question before the Court, however, is not whether the blog authors could serve as fair and impartial jurors, but whether an impartial jury can be selected from among the 1.6 million citizens, from five counties, who make up the Court’s jury pool.”). State v. Berecz (No. 08CA48, January 21, 2010)(Ohio Ct.App.2010) (not reported in N.E.2d) (“In the absence of showing resulting bias, ‘pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.’ State v. Lundgren, 73 Ohio St.3d 474, 479, 1995-Ohio-227, 653 N.E.2d 304, quoting Nebraska Press Assn. v. [Stuart ] (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.”).
Thus, the trial court did not abuse its discretion by denying McMillan’s motion for a change of venue.
XII.
McMillan argues that the trial court erroneously granted the State’s motion in limine to prevent McMillan from arguing for mercy and making an argument regarding residual doubt at the penalty stage of the trial. The record indicates that McMillan failed to object to the trial court’s ruling on this motion. Therefore, this matter is due to be evaluated pursuant to the plain-error rule. See Rule 45A, Ala.R.App.P.
“Residual doubt is not a mitigating circumstance; thus, there is no right to a residual-doubt instruction in the penalty phase of a capital-murder trial. See Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999); Myers v. State, 699 So.2d 1281 (Ala.Crim.App.1996); and Harris v. State, 632 So.2d 503 (Ala.Crim.App.1992).
“Moreover, in Franklin v. Lynaugh, the United States Supreme Court stated:
“‘Our edict that, in a capital case, “ ‘the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense,’ ” Eddings v. Oklahoma, 455 U.S. 104, 110[, 102 S.Ct. 869, 71 L.Ed.2d 1] (1982) (quoting Lockett [v. Ohio ], 438 U.S. [586], at 604[, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ]) in no way mandates reconsideration by capital juries, in the sentencing phase, of their “residual doubts” over a defendant’s guilt. Such lingering doubts are not over any aspect of petitioner’s “character,” “record,” or a “circumstance of the offense.” This Court’s prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.’
“487 U.S. at 174, 108 S.Ct. 2320.”
Smith v. State, [Ms. CR-97-1258, January 16, 2009] — So.3d -, - (Ala.Crim.App.2009). See also Sharifi v. State, 993 So.2d 907, 950 (Ala.Crim.App.2008), cert. denied, Sharifi v. Alabama, 555 U.S. 1010, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008) (“Moreover, ‘residual doubt’ is not a mitigating circumstance. ‘ “ ‘Residual doubt’ is not a factor about the defendant or the circumstances of the crime. It is instead a *245 lingering uncertainty about facts, a state of mind that exists somewhere between ‘beyond a reasonable doubt’ and ‘absolute certainty.’ ” ’ Harris v. State, 632 So.2d 503, 535 (Ala.Crim.App.1992), quoting Franklin v. Lynaugh, 487 U.S. 164, 187-88, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).”).
In Smith v. State, supra, Smith argued that he was entitled to a jury instruction in the penalty phase of his trial on the role of mercy. This Court found no plain error in the trial court’s refusal to give such an instruction and held that “[a] capital defendant is not entitled to a mercy instruction in the penalty phase. See Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999).” Smith v. State, - So.3d at -.
Thus, there was no plain error in the trial court’s granting of the State’s motion in limine to prevent the defense from making arguments for mercy or regarding residual doubt.
XIII.
McMillan argues that the trial court erred by denying his motion to suppress the evidence collected from the truck.[29] He argues that because the State disposed of the truck after the State’s expert processed the truck without allowing the defense the opportunity to test the evidence he was denied his rights to due process and to a fair trial. McMillan also contends that the trial court used the improper basis for its decision because the court considered only whether the prosecutor acted in bad faith rather than also considering the materiality of the evidence and its importance to the defense.
A.
McMillan contends that the victim’s truck should not have been processed by the State and then returned to the lien-holder without allowing the defense the opportunity to test the evidence. McMillan alleges that the fingerprint evidence from the truck was the only evidence the State had to connect McMillan to the truck. He notes that his fingerprints were not on the murder weapon, the bullets, or the casings. Moreover, he points out that there was no other forensic evidence, such as blood, hair, or DNA evidence found at the scene connecting him to the murder. Therefore, he submits that the evidence from the truck was critical to the defense because there were 25 fingerprints that were never identified.[30]
Further, he argues as to the importance of the State’s failure to allow him to independently test the evidence because the State’s expert testified in contravention of his theory of defense that none of the unidentified prints matched the fingerprints of Rondarrell Williams.[31]
The courts in Alabama evaluate a defendant’s claim concerning the loss or destruction of evidence by determining whether the State acted in bad faith and whether the evidence was so critical to the defense that its loss or absence denied the defendant a fair trial.
“This Court in May v. State, 710 So.2d 1362 (Ala.Crim.App.1997), stated:
“ ‘The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala. *246 1992), adopted the United States Supreme Court’s position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
“ ‘ “ ‘Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.’ Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. ‘The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police’s knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.’ Youngblood, 488 U.S. at 57, 109 S.Ct. 333 (footnote), 109 S.Ct. at 337, 109 S.Ct. 333 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).”
“ ‘605 So.2d at 1240-41. Gingo additionally recognized that a defendant’s right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. ' (citing Youngblood, 488 U.S. at 67, 109 S.Ct. at 342).
[[Image here]]
“... In a similar case we stated:
“ ‘In Ex parte Dickerson, 517 So.2d 628 (Ala.1987), the Alabama Supreme Court addressed the issue of whether a defendant’s rights under the Due Process Clause had been violated by the prosecution’s failure to produce an allegedly exculpatory videotape. The police had erased the tape because they did not believe that the contents were relevant. Although bad faith apparently could not be attributed to the prosecution, the court stated that “under controlling authority, the good or bad faith of the prosecution is irrelevant.” Dickerson, 517 So.2d at 630. The court determined that the defendant’s right to due process had been violated by the State’s destruction of a tape and stated:
“ ‘ “It is not in the interest of justice to permit the prosecution, in its unfettered discretion, to determine the favorable or unfavorable nature of potentially exculpatory evidence, and then allow the prosecution to destroy the evidence, thereby forcing the defendant to establish the favorable nature of evidence that no longer exists. In the present case, since the prosecution was attempting to establish constructive possession of the pistol, the video tape would have been favorable to the defendant if it showed that the defendant was away from the car and that the car door was closed. Through inconsistent statements, the police officers attempted to establish that the video tape was not favorable to the defendant because the tape depicted only a portion of the arrest scene. Additionally, the prosecution summarized that the video was immaterial because several officers had testified as to the same evidence that would have been depicted by the video tape.
“ ‘ “The fact remains that the police officers intentionally destroyed the video tape after making their own determination as to its favorable or unfavorable nature. This act substantially impaired the defendant’s ability to establish the favorable nature of the evidence *247 and violated the defendant’s right to due process.”
‘“Dickerson, 517 So.2d at 630-31. (Emphasis added.)....
“ ‘ “Although to show bad faith, for the purpose of showing [a] due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, ‘there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.’ Youngblood, 488 U.S. at [61, 109 S.Ct. at 339] (Stevens, J., concurring in the result).”
“ ‘Ex parte Gingo, 605 So.2d 1237, 1241 (Ala.1992) (emphasis added).’ ”
Snyder v. State, 893 So.2d 488, 528-30 (Ala.Crim.App.2003), cert. denied, 893 So.2d 563 (Ala.2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005) (finding no bad faith by the State and no evidence indicating that the loss of the evidence was so critical to Snyder’s case as to deprive him of a fair trial).
In the present case, the forensic evidence from the truck was not destroyed as the result of bad faith on the part of the State. The State’s expert processed the truck and preserved the evidence that was gathered, including the fingerprint evidence, for examination by the defense. Although the truck was not available for processing by McMillan, there is no indication in the record that the fact that it was not available was the result of bad faith by the State.
The victim’s wife testified that the truck had been financed through Max Federal Credit Union and that the credit union had agreed to take the truck back to auction it, in order to settle the victim’s debt as to the truck. (R. 164.) Moreover, Investigator Pelham testified that it was not the practice of the Millbrook Police Department to take possession of a vehicle in a stolen-vehiele or murder case and to hold it until trial. (R. 213.)
The prosecutor thus argued in response to McMillan’s motion to suppress:
“I would like to pose a hypothetical question and say had the police department, after it removed the fingerprints and had the fingerprint cards saved and took the swabbings and the photographs and inventoried it and kept a list of everything that came out and stored it in their evidence room, if they had told [the] Credit Union go pound sand and told the estate of Bryan Martin go pound sand, we’re going to hold on to this indefinitely, even though we ain’t making the payments, we’re not going to give you any money for it, at that point is the State not committing a taking for which we would be responsible? I think once that probable cause or once that need for possessing the truck evaporates, law enforcement has a duty to return property to its rightful owner once it’s no longer needed.”
(R. 222.)
The record also reveals that the forensic evidence from the truck that was not available to McMillan, specifically any fingerprint evidence that might have been missed in the truck and possibly any unidentified fingerprint evidence,[32] was not so critical to the defense as to deny McMil *248 lan of a fair trial. The fingerprint evidence that was lifted from the truck consisted of 60 prints, 33 of which were matched to McMillan. This evidence was available to McMillan for inspection and examination.
Moreover, this fingerprint evidence was not the only proof that McMillan was in the truck. The video taken by the Wal-Mart store surveillance of the parking lot reveals that the shooter drove away in the truck and was wearing the same clothes revealed by the testimony to have been worn by McMillan on the night of the offense. The photographic evidence also indicated that McMillan possessed the clothing.
Further, a considerable number of items were removed from the truck that were proven to belong to McMillan. Several of the victim’s possessions were mixed in with McMillan’s belongings. Also, McMillan’s signature appeared on one of the ownership documents pertaining to the truck.
The possibility that any of the unidentified or undiscovered fingerprints may have been linked to a third party would not have provided any relevance or import to McMillan’s guilt or innocence. Therefore, this evidence was not so critical to the defense that its not being available would have denied McMillan of a fair trial.
Similarly in Grissom v. State, 624 So.2d 706 (Ala.Crim.App.1993), this Court wrote:
“In this case, the appellant contends that he did not meet with NeCaise and that he did not sell him any drugs. He contends that the tape would have shown that the person with whom Ne-Caise spoke was not him.
“While we concede that it is possible that an examination of the tape recording could have revealed that someone other than the appellant had sold Ne-Caise marijuana, we are not prepared to say that the tape recording was so critical that the police’s destruction of the evidence rendered a fair trial impossible. The appellant seems to contend that the tape recording was the only way he could demonstrate his innocence. We are not so persuaded. The appellant did testify at trial to the effect that he did not sell NeCaise marijuana; however, he did little to refute the State’s version of the facts. He did not present any witnesses nor indicate his whereabouts on the day the drug sale occurred. Rather, he merely testified that he was not involved and named other persons who might have been involved.”
Grissom v. State, 624 So.2d at 710. Compare People v. Apodaca, 998 P.2d 25 (Colo.Ct.App.1999) (‘When dealing with eviden-tiary material of which no more can be said than it could have been subjected to tests, a failure to preserve the evidence does not constitute a due process violation unless an accused can show bad faith on the part of the police.”). People v. Williamson, 172 Misc.2d 172, 174, 657 N.Y.S.2d 318, 320 (1997) (“A careful reading of all cases cited by the defendant shows that the defendant is attempting to create a right that has never been recognized, guaranteed, or required under any statute or constitutional mandate whether state or federal. Arizona v. Youngblood, [488 U.S. 51 (1988) ], held that it was not error for the People to fail to preserve evidentiary material of which no more can be said than that it could have been tested and the result may have helped the defendant.”). State v. Taylor, 362 N.C. 514, 525-26, 669 S.E.2d 239, 252-53 (2008) (“when the evidence is only ‘ “potentially useful” ’ or when ‘ “no more can be said [of the evidence] than that it could have been subjected to tests, the results of which might have exonerated the defendant,” ’ the state’s failure to preserve the evidence *249 does not violate the defendant’s constitutional rights unless the defendant shows bad faith on the part of the state. State v. Mlo, 335 N.C. 353, 373, 440 S.E.2d 98, 108 (1994) (quoting Youngblood, 488 U.S. at 57-58, 109 S.Ct. 333), cert. denied, 512 U.S. 1224, 114 S.Ct. 2716, 129 L.Ed.2d 841 (1994); accord State v. Hunt, 345 N.C. 720, 725, 483 S.E.2d 417, 420-21 (1997); State v. Drdak, 330 N.C. 587, 593-94, 411 S.E.2d 604, 608 (1992). The United States Supreme Court has noted the difficulties involved in requiring a state ‘to take affirmative steps to preserve evidence on behalf of criminal defendants,’ [California v.] Trombetta, 467 U.S. [479] at 486, 104 S.Ct. 2528 (1984) ], and has stated that ‘police do not have a constitutional duty to perform any particular tests’ on crime scene evidence or to ‘use a particular investigatory tool,’ Youngblood, 488 U.S. at 58-59, 109 S.Ct. 333 (stating also that the Due Process Clause does not ‘impose[ ] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution’).”). State v. Frasure, [Ms. No. 2007-A-0033, March 28, 2008] (Ohio Ct.App.2008) (“Since its inception, the majority of states, including Ohio, have adhered to the holding of Youngblood. However, the modern trend appears to be shifting away from the bright-line test established in Youngblood in favor of a balancing test. See, e.g., Deberry v. State (Del.1983), 457 A.2d 744; Thorne v. Dep’t. of Pub. Safety (Alaska 1989), 774 P.2d 1326; State v. Ferguson (Tenn.1999), 2 S.W.3d 912. In Deberry, for instance, the Delaware Supreme Court ‘fashioned a multi-faceted analysis which, in effect, examines the type of evidence, the conduct of the police, and the significance of the evidence in the context of the total quantum of evidence available at trial.’ Dinger at 356. Thus, the courts that have applied a balancing test consider several factors in determining whether a defendant’s due process rights were violated by the missing evidence. In rejecting the holding of Youngblood, courts have voiced their concern that unfairness may result in situations ‘in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.’ Thorne at 1330, n. 9, citing Youngblood, 102 L.Ed.2d at 291 (Stevens, J., concurring). Furthermore, Youngblood does not take into account the materiality of the lost or destroyed evidence or the impact it has on the defendant’s case. See Ferguson at 916-917. The Vermont Supreme Court, in State v. Delisle (Vt.1994), 162 Vt. 293, 648 A.2d 632, 643, cited the following rationale for adopting a balancing test in its prior decision of State v. Bailey (1984), 144 Vt. 86, 475 A.2d 1045, 1049, that takes into account ‘(1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial.’ The court stated: “We believe, however, that Youngblood is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant. Because the Bailey test balances the culpability of the government’s actions and the prejudice to a defendant, we adopt it as the state constitutional standard.’ ”).
Because the fingerprint evidence removed and identified by the State’s expert was available to the defense and because there is no indication that any other excul *250 patory evidence from the truck existed, McMillan has failed to prove that any evidence was lost or destroyed that would have been critical to his defense. Moreover, there is no indication, or argument by McMillan, as to bad faith on the part of the State.
B.
The trial court did not improperly determine that McMillan’s motion to suppress the truck itself was due to be denied upon considering only whether the State had acted in bad faith.
Following the hearing on the motion to suppress, the trial court stated:
“THE COURT: Okay. All right. With regard to the motion to suppress the truck itself and the items and the evidence secured from the truck, the Court denies that motion as well. If you assume that the truck itself was evidence and that that evidence was destroyed, which I don’t know that I’m willing to really go that far, but let’s just assume that that is, the Court finds that there is no bad faith on behalf of the State of Alabama or law enforcement in doing — or allowing [the credit union] to take the truck itself pursuant to an agreement which [the credit union] entered into with the estate of the deceased. The results of any evidence or any things of evidentiary value that was removed from the truck are available and have been made available to the defense for examination and for review. So that’s my ruling with regard to the truck itself.”
(R. 230-31.)
The trial court considered that McMillan was privy to the evidence obtained from the truck. Thus, the trial court considered any effect this evidence might have had as to McMillan’s defense.
XIV.
McMillan further argues that the evidence gathered from the truck should not have been admitted into evidence because, he argues, the State failed to prove a proper chain of custody. McMillan specifically argues that because there was a break in the chain of custody from the time that the truck was seized by the Montgomery Police Department until it was taken into custody by the Millbrook Police Department, the evidence removed from the truck should not have beén admitted into evidence.
However, according to the testimony by the officers on the scene when the truck was recovered in Montgomery in the parking lot of an apartment complex, the truck remained in the parking lot under police protection until a Millbrook police officer took possession of the truck approximately 30 to 45 minutes later. Thus, although the officers were unable to verify exactly which officers had touched the truck and possibly moved the truck so that it was not blocking the parking lot, this possibility would amount only to a weak link in the chain of custody, rather than a missing link.
“ ‘ “A showing that there was no break in the chain of custody is required to establish a sufficient predicate for admission into evidence. Ex parte Yarber, 375 So.2d 1231 (Ala.1979), reversed on other grounds, 437 So.2d 1330 (Ala.1983). The identification of the evidence and continuity of possession must be sufficiently established in order to assure the authenticity of the item, Ex parte Yarber, supra.
“ ‘ “This state employs two separate standards for testing the chain of custody — the weak link test announced in Sommer v. State, 489 So.2d 643 (Ala. *251 Crim.App.1986), and the missing link test announced in Mauldin v. State, 402 So.2d 1106 (Ala.Crim.App.1981).
“ ‘ “Where a weak link in the chain of custody is found, the weight and credit afforded the evidence, rather than its admissibility, [are] questioned. Sommer, supra. Where a break in the chain of custody, or a ‘missing link’ in the chain of custody is shown, the admissibility of the evidence is questioned, Mauldin, supra.”
“ ‘Ex parte Williams, 548 So.2d 518, 520 (Ala.1989) (emphasis in original).’ ”
Birge v. State, 973 So.2d 1085, 1097-98 (Ala.Crim.App.2007).
“[T]he State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
“The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
“If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.”
Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991).
In Ex parte Mills, 62 So.3d 574, 596 (Ala.2010), the Alabama Supreme Court found that, “at worst,” the challenged evidence constituted a “weak link” rather than a “missing link” in the chain of custody. The Court distinguished the facts in Mills from those in Birge v. State, supra,[33] in which “evidence indicated that several different unidentified individuals could have handled the specimens and there were discrepancies in the records about the specimens.” Moreover, the Court noted that Mills “made no ‘showing of ill will, *252 bad faith, evil motivation, or some evidence of tampering’ while the items were at [the Department of Forensic Sciences].” Id., quoting Lee v. State, 898 So.2d 790, 847 (Ala.Crim.App.2001). Further, the facts in Ex parte Mills were distinguishable because there was testimony from the officer who had secured and transported the evidence as well as from the expert who had performed the forensic testing. Finally, the evidence was not the “crux” of the State’s case because there was other evidence indicating that Mills had committed the offense. Ex parte Mills, 62 So.3d at 599.
Here, the testimony established that there was sufficient circumstantial and direct testimony to establish that there was no tampering with the evidence. The record indicates that the victim’s truck was spotted by Cpl. Manora of the Montgomery Police Department on the day following the offense. He followed the truck into the parking lot of an apartment complex where the driver then abandoned the truck. Cpl. Manora testified that “he [the driver] never did pull in a parking space, he just pulled into the driveway itself and he just jumped out and started running.” (R. 992.)
Cpl. Mackey of the Montgomery Police Department testified that he was approximately three minutes away from the apartment complex when he heard over the radio that a police unit was following the truck. He testified that as he entered the apartment complex, he saw Cpl. Manora’s patrol car and another police car.[34] He testified that he saw the truck parked in the same manner as it was shown in the photographs offered as exhibits by the State. (R. 1112.) He pursued the driver of the truck and, shortly, upon losing the driver, returned to the parking lot, where a number of Montgomery Police Department vehicles had arrived. (R. 1118.)
McMillan’s argument refers to the fact that the truck apparently had to be moved while it was in the parking lot and the record does not establish which officer moved the vehicle. The record includes the following testimony from Corporal Mackey:
“Q. [Prosecutor]: Okay. Is there anything that you recognize about that picture as far as where it’s parked and how it’s parked?
“A. [Corporal Mackey]: That when I pulled well, the way that it’s positioned, it had to be pulled in to the parking lot and backed in.
“Q. Okay. Is it parked in one actual parking space?
“A. No, actually it’s parked in two parking spots.
“Q. And does it appear and did it appear on that day to be backed all the way to the curb?
“A. No. That’s pretty much the position that I recall that it was in the day of.
“Q. Okay. But what I’m asking is, was it backed all the way to the curb?
“A. No. It was parked as if someone parked it in a hurriedly manner, if I can put it like that.
“Q. Okay. When you got to that area where did you park?
“A. I was exactly — I was pulled in, because I pulled in at a rapid pace. And I was pulled almost adjacent to the vehicle here.
“Q. When you came up on that truck were the doors open or closed?
*253 “A. No, to my knowledge, the doors were closed.
“Q. You never saw the doors open at any point in time on that truck?
“A. No, ma’am.
[[Image here]]
“Q. Okay. When you pulled up to the — to where the truck was were there any units behind you, any police units behind you?
“A. At first there wasn’t, I was the third unit there. By the time I got back to my patrol car, there was numerous patrol vehicles there.
“Q. Okay. Was the truck still in the same position?
“A. Yes. It couldn’t have moved, because at that time our patrol cars were in front of it.
[[Image here]]
“Q. Okay. When you pulled up, do you recall whether this truck that you’re looking at there was running?
“A. No. To my knowledge it was not running.
“Q. And just to be clear, that truck never moved from its position as it was in those pictures; is that correct?
“A. No, ma’am.
“Q. Okay. And then Millbrook got there at a later time?
“A. Yes, ma’am.
“Q. But Montgomery was on the scene?
“A. Yes, ma’am.”
(R. 1112-22.)
Thereafter, on cross-examination, Cpl. Mackey testified that the truck was secured by the Montgomery Police Department and treated as a crime scene. (R. 1119.)
Athough the Montgomery police officers who first arrived on the scene chased the driver of the truck and therefore left the truck for approximately 10 to 15 minutes, there is no indication that the truck was tampered with. Compare Maldonado v. State, 268 Ga.App. 691, 603 S.E.2d 58, 60-61 (2004) (“[T]he Miami office and the Washington, D.C. office are simply branches of the federal DEA crime lab; they are not separate laboratories owned by different entities. Absent affirmative evidence of tampering, a crime lab and all its branch offices and employees are considered as a single link in the chain of custody. Givens v. State[, 214 Ga.App. 774, 449 S.E.2d 149 (1994) ] (‘[sjince there is no affirmative evidence of tampering, the trial court did not err in treating the Georgia Crime Lab as a single “link” in the chain of custody for admissibility purposes’). See Whitfield v. State[, 217 Ga.App. 402, 457 S.E.2d 682 (1995) ] (test-results testimony from chemist in Savannah branch of State Crime Lab admissible even though some evidence showed specimen was originally received in the Augusta branch). In both Givens and Whitfield, the absence of any affirmative evidence of tampering was determinative in rejecting the accused’s complaints that not all persons in the chain of custody testified or that the evidence started off in a different branch.”).
The fact that the vehicle might have had to be moved in the parking lot does not indicate or suggest that any evidence in the truck was tampered with or compromised. Further, McMillan does not raise any allegations of breaks in the chain of custody occurring after the Millbrook Police Department took custody of the truck.
“ ‘ “ ‘The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.’ ” Jones v. State, 616 So.2d 949, 951 (Ala.Crim.App.1993) (quoting Williams v. State, 505 So.2d *254 1252, 1253 (Ala.Crim.App.1986), aff'd, 505 So.2d 1254 (Ala.1987)).
“ ““ “ ‘Tangible evidence of crime is admissible when shown to be “in substantially the same condition as when the crime was committed.” And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved “[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.” If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
“ ““ “ ‘The undertaking on that score need not rule out every conceivable chance that somehow the [identity] or character of the evidence underwent change. “[T]he possibility of misidentification and adulteration must be eliminated,” we have said, “not absolutely, but as a matter of reasonable probability.” So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and in the light of surrounding circumstances.’ ” ’
“ ‘ “Moorman v. State, 574 So.2d 953, 956-7 (Ala.Cr.App.1990).”
“ ‘Blankenship v. State, 589 So.2d 1321, 1324-25 (Ala.Crim.App.1991).’”
Ex parte Mills, 62 So.3d at 598 (emphasis omitted).
At worst, there was a weak link in the chain of custody concerning the evidence derived from the truck. Moreover, as in Ex parte Mills, the evidence from the truck was not the “crux” of the case in that there was ample other evidence, including the video surveillance and Williams’s testimony, to connect McMillan to the offense. Ex parte Mills, 62 So.3d at 598. Therefore, the evidence was properly admitted and the trial court did not err by denying McMillan’s motion to suppress this evidence.
XV.
McMillan argues that the trial court erred by allowing the admission of prejudicial and gruesome autopsy photographs. He contends that certain of the photographs, particularly those showing the use of probes, distorted the body and were unnecessarily graphic.
In the present case, the autopsy photographs displayed the victim’s wounds and thus illustrated and corroborated the testimony presented concerning his injuries and cause of death. Moreover, the probes showed the trajectories of the bullets through the victim’s body, which were particularly relevant in this case because McMillan argued that the victim was not in the truck when he was shot.
In Bankhead v. State, 585 So.2d 97 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), affirmed on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), reversed on other grounds, 625 So.2d 1146 (Ala.1993), this Court wrote:
“Appellant further argues that, because several slides showed wounds into which probes had been inserted, the slides did not accurately depict the wounds. The State argues, and we agree, that while probes were shown in some wounds, they were inserted for the sole purpose of illustrating the depth and nature of the wounds, relevant factors in determining whether the crime was especially heinous, atrocious, or cruel. The probes were consistently point *255 ed out to the jury, and their function was explained. Moreover, the use of the probes did not distort the size of the wounds so that they appeared larger than they actually were; thus, this case is distinguished from Wesley v. State, 32 Ala.App. 383, 26 So.2d 413 (1946). Therefore, the jury could not have been misled by the insertion of probes into certain of the wounds.”
Bankhead v. State, 585 So.2d at 110-11.
“Additionally, autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries. See Dabbs v. State, 518 So.2d 825 (Ala.Crim.App.1987).” Sneed v. State, 1 So.3d 104, 133 (Ala.Crim.App.2007), cert. denied, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009). “The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, supra, 494 So.2d at 141.” Bankhead v. State, 585 So.2d at 109-10.
The trial court did not abuse its discretion by allowing these photographs into evidence.
XVI.
McMillan argues that the trial court made several erroneous rulings with regard to the jury selection. Specifically, McMillan contends that the trial court should have removed a potential juror for cause and that a member of the jury should have also been removed by the trial court. Moreover, he argues that the trial court should not have death-qualified the venire panel, because its doing so resulted in a conviction-prone jury.
A.
McMillan submits that the trial court should have removed Juror No. 35, who served on the petit jury. He alleges that she should have been removed because she indicated that she preferred the death penalty, which, he says, proved that she could not serve as a fair-minded member of the jury.
However, a review of the record concerning the voir dire examination reveals that, although this juror indicated that she “would lean more towards the death penalty if [the trial court] fmd[s] him guilty” during initial questioning, she and other potential jurors who had answered similarly were subsequently asked by the trial court the following questions:
“If you were selected to be on this jury, regardless of how you might feel right now, are you able to listen to the testimony and look at and listen to the evidence in this case and base your decision wholly and solely on the evidence that’s presented to you and on the law as I give it to you? Okay. That’s the question....”
(R. 505.) Juror No. 35 then answered affirmatively.
“ ‘ “ ‘[A] preference [toward imposing the death penalty], where the potential [juror] indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.’ ” ’ Hagood v. State, 777 So.2d 162, 175 (Ala.Crim.App.1998), aff'd in pertinent part, rev’d on other grounds, 777 So.2d 214 (Ala.1999), on remand to, 777 So.2d 221 (Ala.Crim.App.2000), opinion after remand, 777 So.2d at 223 (Ala.Crim.App.2000), quoting Price v. State, 725 So.2d 1003, 1024 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting, in turn, Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 *256 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).”
McNabb v. State, 887 So.2d 929, 945-46 (Ala.Crim.App.2001). See Brown v. State, 11 So.3d 866, 889 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, Brown v. Alabama, 557 U.S. 938, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009) (“The voir dire examination reflects that prospective jurors W.C. and C.D. stated that they believed in the death penalty. Neither said, as Brown asserts, that they would automatically vote for death in this case. They said that they would consider it as a sentencing option. There was no error in the circuit court’s failure to sua sponte remove these jurors for cause.”).
In light of Juror No. 35’s statement that she could follow the law and the evidence, there was no error in the trial court’s failure to sua sponte remove this juror from the venire or from the jury.
B.
McMillan argues that Juror No. 15, who did not serve on the jury, should have been removed from the venire for cause. The record indicates that defense counsel moved that this potential juror be removed for cause “because he was actually sitting in the Courtroom reading the paper with the article in it about the trial today. And also he’s had contact with the victim’s family here at the Courthouse today.” (R. 668.)
The record reveals that potential Juror No. 15 was questioned individually by the court because he had indicated that he needed to discuss a matter with the court. He informed the judge that, as he had previously answered, he knew some of the victim’s family. He stated that it was his belief that the family might prefer that he not serve on the jury. When further questioned concerning the reason for his belief, he stated that the family had spoken to him on the way to lunch and indicated that he should not be on the jury because he knew them. (R. 544.)
Defense counsel then stated to him that he had noticed that he was reading a newspaper in the courtroom that day. The following transpired:
“[Defense counsel]: There was a story in the newspaper today, did you read that?
“PJ [No. 15]: I think I told him, I read the Advertiser every day, so yes.
“[Defense counsel]: Did you read the story about this particular case?
“PJ [No. 15]: Today I did, yes.
“[Defense counsel]: You did?
“PJ [No. 15]: Yes.
“[Other defense counsel]: Will you be able to do what the Judge says as far as not paying attention to the news media?
“PJ [No. 15]: Yes, sir. I’m already gearing up. You know, if it’s my call to be here, I will not be participating in any news activities until I have fulfilled my obligations.
“[Other defense counsel]: And the fact that you’ve seen Calvin in pictures or whatever in those newspapers, would those bias you at all and make you link him to this offense based on the fact that you read it in the newspaper all the time?
“PJ [No. 15]: I do not recall seeing him in the paper. I honestly do not recall if they had a picture of him in the paper, I must not have.
[[Image here]]
“[Prosecutor]: In the paper this morning there was a few facts about the case, about what may or may not have happened. Did you read that portion of it or do you recall that?
“PJ [No. 15]: I read the entire article.
“[Prosecutor]: Okay.
*257 “PJ [No. 15]: I didn’t see anything that stood out or that was anything I hadn’t heard in the past that I’m aware of.
“[Prosecutor]: Okay.
“[Other prosecutor]: Just you might want to follow-up with would you be able to—
“THE COURT: Yeah. Based on what I know, and I don’t know any evidence because we haven’t heard any evidence.
“PJ [No. 15]: Right.
“THE COURT: —but it’s been my experience over the years that about 90 percent of the time they don’t get it right when they write it in the paper. So, you know, regardless of whatever our friend Marty might have written and was in the paper this morning, would you be able to set that aside and base your decision on the evidence?
“PJ [No. 15]: Well, I will tell you this now. I have been involved in activities in the past where I was quoted in the newspaper and I didn’t think that they was talking to the same guy when I read it the next day.
“THE COURT: Yeah, you’ve been with us. You have been with us. Okay.
“PJ [No. 15]: I’m not going to mortgage the farm on what they said on the front page of the Advertiser.
[Prosecutor]: I’m more concerned about another point. Judge. The Judge gave an instruction earlier that, you know, we as lawyers can’t talk to you one on one, you know, hanging out in the hallway and that no one else should talk to you.
“PJ[No. 15]: Right.
“[Prosecutor]: First of all, other than just saying you shouldn’t be on this ease, did the victim’s family say anything else to you about this case at all?
“PJ [No. 15]: No. No.
“[Prosecutor]: Okay. And did you actually engage them in conversation or was it one way?
“PJ [No. 15]: No, this is the way— this is what happened. I knew that there was a teacher at Holtville Middle School that was the mother-in-law. I knew the people that I saw in the hallway. I did not realize they were one and the same. They came to me and said, you know, basically you shouldn’t be on this jury. And then that was the first time I realized that that’s even who they were, because they are acquaintances. And the only reason I brought it up to him was I just wanted to make sure he understood that when y’all were questioning me out there I didn’t feel comfortable speaking out, you know, in front of them.
“[Prosecutor]: But other than that, nothing was said to influence you one way or the other about the facts of this case?
“PJ [No. 15]: No, absolutely not. Like I say, I didn’t even realize that’s who they were until I was walking out the door going to lunch.”
(R. 545-48.)
Although the potential juror should not have read the newspaper or spoken with members of the victim’s family, this conduct did not require his removal for cause. See Smith v. State, [Ms. CR-97-1258, August 31, 2007] — So.3d -, - (Ala.Crim.App.2007) (opinion after remand from the Alabama Supreme Court) (“any error in the failure to remove M.T. on the basis of her conversation with a victim’s family member was harmless”).
“ ‘ “Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion.” ’ Burgess *258 v. State, 827 So.2d 134, 157 (Ala.Cr.App.1998), quoting Gaffney v. State, 342 So.2d 403, 404 (Ala.Cr.App.1976), cert. denied, 342 So.2d 404 (Ala.1977). In discussing claims involving alleged juror misconduct, we said the following in Sistrunk v. State, 596 So.2d 644 (Ala.Cr.App.1992):
“ ‘ “In the absence of any showing to the contrary, we must assume that the trial judge was satisfied as to the nature of the conversation which passed between the witness and the juror, and upon this basis decided that the appellant was not prejudiced thereby. Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion. Gaffney v. State, Ala.Cr.App., 342 So.2d 403, [1976], cert. denied, Ala., 342 So.2d 404 (197[7]). This ruling will not be disturbed in the absence of a showing of abuse of discretion.”
“ ‘Cox v. State, 394 So.2d 103, 105-06 (Ala.Cr.App.1981).’ ”
Gamble v. State, 791 So.2d 409, 432 (Ala.Crim.App.2000).
“Moreover, the Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002).” Pace v. State, 904 So.2d at 341. See also Brownfield v. State, 44 So.3d 1, 34 (Ala.Crim.App.2007), affirmed, Ex parte Brownfield, 44 So.3d 43 (Ala.2010) (“Here, as in Bethea, Brownfield has offered no evidence that the jury ultimately impaneled was biased. Brownfield concedes in his brief that he exercised a peremptory challenge to remove D.W. from the venire, and it is apparent from the record that prospective jurors J.C., A.M., and H.P. were not selected to serve on the jury empaneled to hear the case. Therefore, even if the trial court’s refusal to remove the complained-of venire-members for cause was error, the error was harmless.”).
Here, the trial court reasonably investigated the substance and circumstances of the conversation between the potential juror and the victim’s family and was satisfied that the juror’s serving on the jury would not deny McMillan his right to a fair trial. This potential juror did not serve on the jury, and there is no indication of prejudice caused to McMillan as a result of the conversation. The trial court did not abuse its discretion.
Further, his conduct in reading the newspaper did not require his removal for cause. He did not read anything that was inflammatory or prejudicial, and he indicated that he was not biased by the article. There is no suggestion in the record that any other potential juror was privy to the article.
In Pace v. State, 904 So.2d 331 (Ala.Crim.App.2003), Pace requested that a juror who had read two newspaper articles about the case be struck for cause. During questioning, the juror assured the trial court that he could set aside what he had read and base his decision on the law as instructed. This Court determined that the trial court did not err by refusing to remove the juror for cause.
“ ‘ “Whether vel non the reading of a newspaper article has influenced the jury to the detriment of appellant is a question to be determined by the trial court in the exercise of its sound discretion.” Williams v. State, 410 So.2d 911, 913 (Ala.Crim.App.1982). Even when jurors read newspaper accounts of the case, a verdict will not be disturbed if the trial court determines *259 that none of the jurors was affected by the article. Wiggins v. State, 429 So.2d 666 (Ala.Crim.App.1983); Flowers v. State, 402 So.2d 1118 (Ala.Crim.App.1981).’
“Robinson v. State, 577 So.2d 928, 931 (Ala.Crim.App.1990). See also Burell v. State, 680 So.2d 975 (Ala.Crim.App.1996).”'
Rogers v. State, 819 So.2d 643, 655 (Ala.Crim.App.2001).
In the present case, the trial court did not abuse its discretion in denying McMillan’s motion to remove this potential juror for cause.
C.
The trial court did not err in death-qualifying the jury panel and doing so did not result in a death-prone jury. This argument has been addressed previously and decided adversely to McMillan.
“In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), we stated:
“ ‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 10 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-quali-lying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“718 So.2d at 1157. There was no error in allowing the State to death qualify the prospective jurors.”
Brown v. State, 11 So.3d 866, 891 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, 557 U.S. 938, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009).
XVII.
McMillan argues that the prosecutor and the trial court improperly diminished the role of the jury. Specifically, he contends that the prosecutor’s arguments and the trial court’s instructions made the jury feel less responsible for its role in the sentencing phase than it should. McMillan argues that by allegedly misleading the jury in this way, the trial court and the prosecutor denied him his rights to due process.
McMillan failed to object on this ground at trial.[35] Therefore, this issue is due to be analyzed pursuant to the plain-error rule. See Rule 45A, Ala.R.App.P.
McMillan cites the following comments by the prosecutor:
“[Defense counsel] suggested that Calvin McMillan’s life is in your hands and I respectfully disagree. His life is in the hands of a court of law. A court of law that follows due process, a court of law that follows rules and procedures, and a court of law that is going to be governed by the instructions of this Court. You did not put yourself in that *260 jury box, Calvin McMillan put you in the jury box. We did not put Calvin McMillan in that chair; he put himself in that chair. He will be judged by the law as you’re given it by the Judge in your determination of the facts. His life is not in your hands. His life is in the hands of the law that we have all sworn an oath to uphold and to follow the instructions of the Court and that’s what I’m going to ask you to do when you go back there.”
(R. 1788-84.)
These comments by the prosecutor address the legal system and ask the jury to do its duty in following the trial court’s instructions. Moreover, the prosecutor was responding to defense counsel’s argument in closing in which he stated: “Calvin McMillan’s life is literally in your hands collectively and individually.” (R. 1772.) See Burgess v. State, 827 So.2d 134, 167 (Ala.Crim.App.1998), affirmed, 827 So.2d 193 (Ala.2000), cert. denied, Burgess v. Alabama, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed.2d 335 (2002) (“A review of the entire argument shows this comment was made in response to the defense’s argument that the jury was going to ‘kill’ or ‘take the life’ of Burgess if it imposed the death penalty.”).
He also quotes to these instructions by the trial court:
“The issue at this sentencing hearing concerns the existence of aggravating and mitigating circumstances which you should weigh against each other to determine the punishment that you recommend. Your verdict recommending a sentence should be based upon the evidence that you’ve heard while deciding the guilt or the innocence of the defendant and the evidence that has been presented to you in these proceedings. The trial judge, that’s me, must consider your verdict in recommending a sentence in making a final decision regarding the defendant’s sentence.
“... This aggravating circumstance therefore shall be considered by you in deciding whether to recommend a sentence of life imprisonment without eligibility for parole or death.
“In order to bring back a verdict recommending the punishment of death, at least ten of your number must vote for death. ... Any number less than ten cannot recommend the death penalty.
“In order to bring back a verdict recommending a sentence of life imprisonment without parole, at least seven jurors must vote to impose that sentence. In other words, in order for a verdict to be returned recommending imprisonment for life without parole, it must be unanimous, or 11 for life imprisonment without parole and one for death, or ten for life imprisonment without parole and two for death, or nine for life imprisonment without parole or three for death, or eight for life imprisonment without parole and four for death, or seven for life imprisonment without parole and five for death. Any number less than seven cannot recommend life imprisonment without parole.
“If after full consideration of all of the evidence you’re convinced that the aggravating circumstance and mitigating circumstances are of equal weight, then the defendant is entitled to a recommendation of imprisonment for life without the possibility of parole. I, as trial judge, am required to treat your, the jury’s, recommendation of a sentence of life imprisonment without parole as a mitigating circumstance in my consideration as well. In addition to the recommendation of either death or life imprisonment without parole, your verdict form must contain the numerical vote; *261 not who voted in which way, but the actual count.
“Now, ladies and gentlemen, if after full and complete consideration of all of the evidence in the case you’re convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, and you’re convinced that the aggravating circumstance outweighs the mitigating circumstances, your verdict would be “We, the jury, recommend that the defendant, Calvin McMillan, be sentenced to death. The vote is as follows’ ....
“However, if after full and fair consideration of all of the evidence you’re not convinced beyond a reasonable doubt that the aggravating circumstance exists or that the aggravating circumstance does not outweigh the mitigating circumstances, your verdict would be ‘We, the jury, recommend that the defendant, Calvin McMillan, be punished by life imprisonment without parole’.... ”
(R. 1786-93.)
These instructions by the trial court were proper statements according to the law and the procedural rules for judicial proceedings in Alabama. The Alabama Supreme Court has held:
“It is well established that ‘the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was “advisory” and a “recommendation” and that the trial court would make the final decision as to sentence does not violate Caldwell [v. Mississippi, 472 U.S. 320 (1985) ].’ Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.[1988]), affirmed, 548 So.2d 496 (Ala.198[9]), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), affirmed, 587 So.2d 1236 (Ala.1991); cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In sum, we find no error, plain or otherwise, in the comments of the prosecutor, or in those of the trial judge, regarding the jury’s role in sentencing in a capital murder trial.”
Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995).
In the present case, neither the trial court’s instructions nor the prosecutor’s conduct diminished the role of the jury so as to deny McMillan his rights to a fair trial.
XVIII.
McMillan argues that there was insufficient evidence to convict him of murder made capital because it was committed while the victim was in a vehicle.
According to § 13A-5-40(a)(17), Ala. Code 1975, the State was required to present evidence of “[mjurder committed by or through the use of a deadly weapon while the victim is in a vehicle.” Count II of the indictment charged McMillan as follows:
“The Grand Jury of said county further charge that, before the finding of this indictment, CALVIN MCMILLAN, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of JAMES BRYAN MARTIN by shooting him with a deadly weapon, to-wit a 9 mm. handgun, while JAMES BRYAN MARTIN was inside a vehicle, to-wit; a 2004 Ford F-100 truck, in violation of Section 13A-5-40(A)(17), Code of Alabama, 1975.”
McMillan argues that the State failed to meet its burden of proving that Martin was in the truck when he was shot. He *262 argues that the State’s witnesses testified that they had heard the shots when they saw Martin confronted by the perpetrator while he was outside the truck. Therefore, he contends, the State failed to show that the victim was shot while he was inside the truck. McMillan also argues as proof of the lack of evidence that no casings or ballistic evidence was found in the truck, and the medical examiner testified that all the bullets exited the victim so that such evidence should have been found in the truck. Moreover, no blood was found in the truck.
However, although there was testimony that all four shots occurred while the victim was outside the truck, the State also presented evidence including that the victim was inside the truck at the time of the first shot. Rondarrell Williams testified that when he began walking toward his girlfriend’s vehicle after leaving the Wal-Mart store, he heard a gunshot. He looked in the direction of the shot and saw McMillan “with his hand up raised like that ([i]ndicating) and a truck, a burgundy truck, with the door open.” (R. 1061.) He testified that he then heard two more shots and saw McMillan pull the victim out of the truck. The DVD surveillance evidence[36] of the offense verifies Williams’s testimony — it displays the brake lights of the truck turning on and going off after the shooter appeared to fire his gun into the truck. It further shows that Martin was drug out of the vehicle and collapsed on the pavement where he was shot again.
Thus, although the evidence was conflicting, there was sufficient evidence presented by the State to support the jury’s verdict. See McElyea v. State, 892 So.2d 993, 996 (Ala.Crim.App.2004) (“Because this argument concerns an apparent conflict in the evidence, it relates to the weight of the evidence, rather than to the sufficiency of the evidence.”). Compare Ex parte Jackson, 614 So.2d 405, 406 (Ala.1993) (holding that because it was undisputed that the victim was not, “at any relevant time, the occupant of a motor vehicle” the capital offense pursuant to § 13A-5-40(a)(17), Ala.Code 1975, was not proven, although Jackson had intended to shoot the occupant of the vehicle).
“ ‘ “The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969).” Walker v. State, 416 So.2d 1083, 1089 (Ala.Cr.App.1982). “It was within the province of the jury to give the evidence in the case whatever weight and emphasis they thought proper in reaching their verdict.” Linson v. State, 394 So.2d 85, 92 (Ala.Cr.App.1981). “Where, as in this case, there is conflicting evidence presented by the prosecution and the defense, it is for the jury to resolve the conflict and determine the defendant’s guilt or innocence. ... In making its determination, the jury may believe or disbelieve all or any part of the testimony presented by either side.” Terry v. State, 424 So.2d 652, 655 (Ala.Cr.App.1982).
“ ‘ “Conflicting evidence always presents a question for the jury unless the evidence fails to establish a prima facie case. Starling v. State, 398 So.2d 337 (Ala.Cr.App.), cert. denied, Ex parte Starling, 398 So.2d 342 (Ala.1981).” Gardner v. State, 440 So.2d 1136, 1137 (Ala.Cr.App.1983).’
“Mosley v. State, 461 So.2d 34, 36 (Ala.Crim.App.1984).”
*263 Dotch v. State, 67 So.3d 936, 964 (Ala.Crim.App.2010).
“Providing the State presents a prima facie case, any inconsistencies and discrepancies in the evidence go to the credibility of the witnesses and present a question for the jury. Such inconsistencies affect the weight rather than the sufficiency of the evidence.” Macon v. State, 652 So.2d 331, 334 (Ala.Crim.App.1994), cert. denied, 652 So.2d 334 (Ala.1994) (citation omitted).
Viewing the evidence in the light most favorable to the State as we are required to do, we conclude that the evidence was sufficient to support the jury’s finding. Further, the weight to be accorded the evidence was properly determined by the jury-
XIX.
McMillan argues that his sentence was unconstitutionally imposed under the Sixth and Eighth Amendments to the United States Constitution. Specifically, he argues that his sentence, entered pursuant to a jury override, was improper under the holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and because Alabama allows a standardless judicial override of a jury’s advisory verdict.
A.
McMillan contends that Alabama’s system of imposing the death penalty is unconstitutional under Ring v. Arizona, supra. Therefore, he argues that because the jury failed to make specific findings concerning its weighing of the aggravating circumstances and the mitigating circumstances in his case, his death sentence was improper. However, this Court has previously determined this issue adversely to McMillan.
“In Sneed v. State, 1 So.3d 104, 143 (Ala.Crim.App.2007), we addressed and rejected a similar argument as follows:
“ ‘[T]he appellant asserts that his conviction violates Ring because the jury did not unanimously determine that statutory aggravating circumstances were present and that the aggravating circumstances outweighed the mitigating circumstances and because it was not required to specify which aggravating circumstances it found to exist.
“ ‘In the guilt phase, the jury unanimously found beyond a reasonable doubt that the appellant committed a robbery during the course of committing a murder. “The jury’s unanimous finding of one aggravating circumstance is sufficient to satisfy Ring.” Ex parte McNabb, 887 So.2d 998, 1006 (Ala.2004). Also, “ ‘[t]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently Ring and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.’ ” Ex parte Hodges, 856 So.2d 936, 943 (Ala.2003) (quoting Ex parte Waldrop, 859 So.2d 1181, 1190 (Ala.2002)).’ ”
Brown v. State, 74 So.3d 984, 1036 (Ala.Crim.App.2010). See also Dotch v. State, 67 So.3d at 988 (“[c]ourts in Alabama have determined that Alabama’s sentencing scheme is not unconstitutional under Ring, or Apprendi because the weighing process undertaken to arrive at a capital sentence is not a finding of fact or an element of the offense; therefore, a jury is not constitutionally required to weigh the aggravating and mitigating circumstances. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Beckworth v. State, 946 So.2d 490, 515 (Ala.Crim.App.2005), cert. denied, 549 U.S. *264 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007).”).
B.
McMillan argues that his sentence was unconstitutionally imposed because, he argued, Alabama allows a standardless override of the jury’s verdict in a capital trial. However, this argument has previously been determined adversely to McMillan. In Doster v. State, 72 So.3d 50, 82 (Ala.Crim.App.2010), this Court stated:
“Doster also argues that Alabama’s sentencing scheme is ‘standardless’ and violates the Eighth Amendment and the Equal Protection Clause of the Constitution.
“Alabama’s death-penalty sentencing scheme has repeatedly withstood constitutional attacks.
“ ‘The appellant maintains that the jury override provision of Ala.Code 1975, § 13A-5-47(e), is unconstitutional. He claims that the statute contains no guidelines for the sentencing judge to follow and that the statute violates the Eighth Amendment, particularly in a case where, as here, the jury unanimously recommends a sentence of life imprisonment without parole.
“ ‘Sentencing by a jury is not constitutionally required. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Proffitt v. Florida, 428 U.S. 242, 251-52, 96 S.Ct. 2960, 2966-67, 49 L.Ed.2d 913 (1976), and § 13A-5-47(e) set “out a standard of review for jury override that meets constitutional requirements.” McMillian v. State, 594 So.2d 1253, 1272-73 (Ala.Cr.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). The argument that the jury override provision of § 13A-5^t7(e) is constitutionally infirm because it allows for the “arbitrary and standardless” imposition of the sentence of death has been repeatedly rejected by the appellate courts of this state. See, e.g., Ex parte Jones, 456 So.2d 380, 381-83 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); McMillian v. State, 594 So.2d at 1272; Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App.1991). See also Ex parte Giles, 632 So.2d 577 (Ala.1993) (holding that Ala. Const. § 11 “does not preclude judicial override of the jury’s sentencing recommendation in a capital case”)
“ ‘The trial court’s sentencing order reflects the fact that the court gave “consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.” R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury’s recommendation. Constitutional and statutory provisions require no more.’
“Carr v. State, 640 So.2d 1064, 1073-74 (Ala.Crim.App.1994). Moreover, as we stated in Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007):
“‘The appellant further contends that, in light of Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ], Alabama’s standardless override results in the arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Equal Protection Clause. “The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code *265 1975 — commonly referred to as the judicial-override statute — against constitutional attack.” Tomlin v. State, 909 So.2d 213, 282 (Ala.Crim.App.2002), rev’d on other grounds, 909 So.2d 283 (Ala.2003). Therefore, the appellant’s argument is without merit.’
“1 So.3d at 143-44.”
Doster v. State, 72 So.3d at 105.
XX.
McMillan argues that Alabama’s manner of execution by lethal injection constitutes cruel and unusual punishment.
This argument has previously been decided adversely to McMillan. “ ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze [v. Rees ], 553 U.S. [35] 50, 128 S.Ct. [1520] at 1531 [(2008) ]. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.” Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008), cert. denied, 557 U.S. 939, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009). See also Doster v. State, 72 So.3d at 107.
“‘Alabama’s method of performing lethal injection is not cruel and unusual.’ Gobble v. State, 104 So.3d 920, 978 (Ala.Crim.App.2010) (footnote omitted). See also Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009).” Phillips v. State, 65 So.3d 971, 1039 (Ala.Crim.App.2010).
XXI.
McMillan argues that the trial court erred in double-counting the robbery element of the capital offense as an aggravating circumstance in the penalty phase.
In Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), this Court stated:
“Brown argues that the court erred in double counting robbery and burglary as both elements of the capital offenses and aggravating circumstances that would support a death sentence.
“ ‘ “The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as ‘double-counting’ or ‘overlap’ and is constitutionally permissible.” Coral v. State, 628 So.2d 954, 965 (Ala.Cr.App.), aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); see also Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); and Hart v. State, 612 So.2d 520 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Section 13A-5-50, Ala.Code 1975, contemplates that certain aggravating circumstances will be considered established for purposes of sentencing when a verdict of guilty of capital murder is returned. That section specifically provides:
“ ‘ “The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A- *266 5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40.” ’
“Whitehead v. State, 777 So.2d 781, 850 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). There was no error here.”
Brown v. State, 11 So.3d at 929.
Although McMillan argues that the use of robbery as an aggravating circumstance at sentencing and as aggravation at the guilt phase resulted in the arbitrary imposition of the death penalty because it failed to narrow the class of cases eligible for the death penalty, this issue has also been determined adversely to McMillan.
In Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001), cert. denied, 823 So.2d 57 (Ala.2001), cert. denied, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002), this Court stated:
“Johnson contends that Alabama’s death-penalty statute, specifically § 13A-5-40(a)(5), Ala.Code 1975, is unconstitutional because, he says, it is arbitrary and fails to narrow the class of death-eligible defendants. (Issue XVI in Johnson’s brief.) In Ex parte Harrell, 470 So.2d 1309 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985), superseded by statute as recognized in Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993), the Alabama Supreme Court held that § 13A-5-40(a)(5) is ‘a reasonable exercise of legislative authority which is neither arbitrary nor capricious in imposing capital punishment upon one who intentionally and knowingly takes the life of a police officer, while that officer is engaged in carrying out his appointed duties, protecting the health, welfare, and property of the.citizens he serves.’ 470 So.2d at 1318.
“Furthermore, in Ex parte Woodard, 631 So.2d 1065 (Ala.Crim.App.1993), cert. denied, 662 So.2d 929 (Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994), this Court, in determining whether § 13A-5-40(a)(15), Ala. Code 1975 (murder of a child under the age of 14 years), sufficiently narrowed the class of ‘death-eligible’ defendants, said:
“ ‘ “A capital sentencing scheme must, in short, provide a ‘ “meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.” ’ [Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) ], quoting Furman v. Georgia, [408 U.S. 238, 313, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972) ] (White, J., concurring)
“ ‘ “This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.”
“ ‘Godfrey v. Georgia, 446 U.S. 420, 427-428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).
“ ‘Alabama’s capital offense statute includes a sentencing scheme that is neither arbitrary nor capricious. Ex parte Hays, 518 So.2d 768, 774 (Ala.1986); Daniels v. State, 534 So.2d 628, 642-45 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).
“ ‘ “The Supreme Court has required heightened reliability in the imposition of the death penalty, but the Court has not mandated any particular state statutory approach *267 to capital punishment. To minimize the risk of arbitrary action and provide individualized sentencing, however, the Court has imposed two general requirements on the capital sentencing process. First, a state must channel the sentencer’s discretion in order to ‘genuinely narrow the class of persons eligible for the death penalty and ... [thus] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.’ Second, the State may not limit the sentencer’s consideration of any relevant evidence that might lead the sentencer to decline to impose the death penalty.
“ ‘ “The required narrowing of the class of death-eligible defendants may occur at either the guilt or the sentencing phase of a capital trial. When narrowing is accomplished during the sentencing phase, the sentencer determines whether certain characteristics of the crime, known as aggravating circumstances, distinguish the gravity of the offense so as to justify the imposition of the death penalty.”
“ ‘Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1471-73 (1993) (footnotes omitted).
“ ‘The required narrowing of the class of death-eligible defendants accused of violating § 13A-5^40(a)(15) occurs at the sentencing phase of the capital trial when the sentencer must determine the existence of at least one of the aggravating circumstances listed in § 13A-5-49. See §§ 13A-5-46(e); 13A-5-47(d) and (e). Furthermore, “the statutory aggravating circumstances may not be added to or expanded.” Nelson v. State, 405 So.2d 392, 400 (Ala.Crim.App.1980), reversed on other grounds, 405 So.2d 401 (Ala.1981).
“ ‘In order for a defendant to be sentenced to death upon a conviction under § 13A-5-40(a)(15), the defendant must be guilty of the intentional murder of a child under the age of 14 years and the sentencer must find the existence of at least one of the aggravating circumstances enumerated in § 13A-4-49, thereby narrowing the class of “death-eligible” defendants.’
“631 So.2d at 1069-70. See also Farrior v. State, 728 So.2d 691, 702 (Ala.Crim.App.1998) (holding that § 13A-5-40(a)(17), Ala.Code 1975 — murder of a victim when the victim is inside a vehicle — was constitutional); and May v. State, 710 So.2d 1362, 1364-65 (Ala.Crim.App.1997)(same).”
Johnson v. State, 823 So.2d at 51-3. (Footnote omitted.) See also Dunaway v. State, 746 So.2d 1021, 1041 (Ala.Crim.App.1998), affirmed, 746 So.2d 1042 (Ala.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000).
Therefore, McMillan’s claims that the trial court erred by double-counting the aggravating circumstances and that this double-counting is unconstitutional because it fails to narrow the class of cases eligible for the death penalty are without merit.
XXII.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of McMillan’s conviction and sentence of death. McMillan was indicted and convicted of capital murder for killing James Bryan Martin during the commission of a robbery in the first degree. See § 13A-5^0(a)(2), Ala.Code 1975. He was *268 also indicted and convicted of capital murder for killing James Bryan Martin by use of a deadly weapon while he was in a vehicle. See § 13A-5-40(a)(17), Ala.Code 1975.
According to Rule 45A, Ala.R.App.P., we have searched the entire proceedings for any plain error that might have adversely affected McMillan’s substantial rights and have found none.
Further, pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of McMillan’s sentence of death. It is the finding of this Court that there is no error in the sentencing that adversely affected McMillan’s rights. The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found the existence of one aggravating circumstance: that the capital offense was committed while McMillan was engaged in the commission of a robbery. § 13A-5-49(4), Ala.Code 1975.
The trial court found the existence of two statutory mitigating circumstances: McMillan’s lack of significant history of prior criminal activity, § 13A-5-51(1), Ala. Code 1975; and McMillan’s age at the time of the offense, § 13A-5-51(7), Ala.Code 1975. With regard to the nonstatutory mitigating circumstances, the trial court considered evidence “that he was raised in extreme poverty; that he was abandoned by his mother; that he was physically abused as a child; that he was raped as a child; that he was a witness to his mother’s and sister’s abuse; that he was raised in the home of an alcoholic/drug addict; that he did not get the treatment he needed; that he had no positive male role models; that he suffered from psychological and emotional difficulties; and that his intellectual functioning was in the borderline range.” (C. 20.) Although the trial court found evidence to support these non-statutory mitigating circumstances, he assigned them “very little weight.” (C. 22.)
The trial court also considered the jury’s recommendation of a sentence of life imprisonment without parole as mitigating evidence.
The trial court determined that the aggravating circumstance outweighed the mitigating circumstances. As to the judge’s findings in weighing the aggravating and mitigating circumstances, he stated:
“Of all the aggravating and mitigating circumstances in this case, this Court places the most weight on the fact that McMillan intentionally killed James Bryan Martin while in the course of robbing him of his truck. Not only is the intentional murder of a human being in order to take their property from them morally and legally reprehensible, but also the commission of such an offense is so reprehensible that it is ‘double counted’ under our law as a reason to make a murder capital and weigh as an aggravating circumstance in favor of the death penalty.
“The facts in this case clearly establish that McMillan set out not only to take another person’s vehicle but also to take their life as well. He calmly and coldly observed unsuspecting citizens while deciding which vehicle he wanted to take. James Bryan Martin just happened to be in the wrong place at the wrong time while running an errand for his family and having a nice truck.
“Not only did McMillan intentionally murder James Bryan Martin in the parking lot of the Millbrook Wal-Mart and drive away in his truck, but he also later signed his name to ownership doc *269 uments attempting to convert the ownership of the truck to himself. McMillan even ate James Bryan Martin’s Reese’s candy and put James Bryan Martin’s rented DVD with his own belongings.
“Facts such as or very similar to these have supported the application of the death penalty many, many times. As a result, this Court weighs the fact that McMillan killed James Bryan Martin while robbing him of his truck and McMillan’s actions leading up to and following the murder as weighing most heavily in fervor of imposing the death penalty.”
(C. 16-17.)
The trial court also further explained its decision that the mitigating evidence was outweighed by the aggravating circumstance as follows:
“The law as it applies to this case requires the Court to weigh the aggravating circumstance against the mitigating circumstances, which includes the jury’s recommended sentence of life without parole.
“This Court has fulfilled that duty and has considered each of McMillan’s mitigating factors as set forth above and all the evidence presented by McMillan at trial, during the penalty phase of this case and at the final sentencing hearing. This Court has also given great consideration to the jury’s recommendation and considers it to be the heaviest miti-gator in this case. After taking all of these factors into consideration this Court cannot find that the mitigating circumstances outweigh the aggravating circumstance of the intentional killing of an innocent victim while in the course of robbing him for his truck. Facts similar to these have led to a sentence of death in many cases. Accordingly, this Court finds that the sentence in this case should be death.”
(C. 28.)
The trial court’s findings concerning the existence and weighing of these circumstances are supported by the record.
It is the decision of this Court that death is the proper sentence in this case. Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to weigh the aggravating circumstances and the mitigating circumstances independently to determine the propriety of McMillan’s sentence of death. An independent weighing of the aggravating and mitigating circumstances indicates that the trial court’s determination was proper and that death is the proper sentence.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether McMillan’s sentence was disproportionate or excessive when compared to the sentences imposed in similar cases. The penalty in this case is neither disproportionate nor excessive when compared to the penalties imposed in similar cases, considering the circumstances surrounding both the crime and McMillan. See, e.g., Dotch v. State, 67 So.3d 936 (Ala.Crim.App.2010); Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010); Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010); Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d - (Ala.Crim.App.2009); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002); Knight v. State, 907 So.2d 470 (Ala.Crim.App.2004).
After carefully reviewing the record of both the guilt phase and the sentencing phase of McMillan’s trial, and for the reasons expressed here, we affirm McMillan’s conviction and his sentence of death.
AFFIRMED.
*270 WISE, P.J., and KELLUM, J., concur. WELCH, J., concurs in part; concurs in the result in Part IV. WINDOM, J., recuses herself.

. Williams testified that he returned to the store because he had forgotten to purchase an item.

. A BOLO is a "be-on-the-lookout” message issued by law enforcement to a number of law-enforcement agencies concerning offenses so that the perpetrator may more quickly be spotted and apprehended. (R. 870.)

. In this photograph, certain shirts are hanging behind McMillan. Among them is a shirt matching the description of the shirt worn by the man who shot Martin.

. Williams also described these clothes as the ones McMillan was wearing on the night of the offense. (R. 1049.) A witness testified that McMillan came by his apartment on the night following the offense and was wearing a striped shirt and an army-fatigue hat. (R. 937-38.) McMillan also showed him the truck. (R. 938.)

.The man changed shirts before getting out of the vehicle the second time and shooting Martin.

. There was a pretrial hearing concerning McMillan's motion to suppress this statement in which the testimony was in accord with that given at trial. Although the testimony in the transcript does not reflect the presence of another officer the tape recording reveals that there was another officer involved in conducting the interview.

. United States v. Searp, 586 F.2d 1117, 1124 (6th Cir.1978).

. Two potential jurors were excused during qualifying. (R. 365-66, 368.) One potential juror did not return. (R. 395, 641.)

. Defense counsel struck one African-American veniremember; two African-American veniremembers were removed for cause. *199 Three African-American jurors served on the jury.

. The veniremember named by defense counsel — Juror 81 — was not African-American.

. Jurors 79 and 173 were the only potential jurors connected with the Hyundai automotive plant. Neither stated that they had known McMillan.

. The record reveals that a white potential juror, Juror 159, whose husband worked for the Wal-Mart store in Millbrook in the electronics department, was removed for cause for another reason.

. However, the record reflects that one African-American potential juror, Juror 175, was removed for cause. (R. 637, Supp. R 148.)

. Furthermore, in Bell v. Haley, supra, the prosecutor made a notation on the strike list next to each African-American veniremember indicating his or her race. Although the strike list in the present case contains information concerning the address, birth date, sex, race, and juror number of each venire-member, no such notation was made by the prosecutor. (Supp. R. 138-151.)

. This finding was made by the circuit court in its determination that Dunaway had failed to establish ineffective assistance of counsel for his counsel’s failure to make a formal Batson motion at trial.

. " ‘[OJnly convictions can negate the statutory mitigating circumstance of no significant prior criminal record. § 13A-5-51, Ala. Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala.Cr.App.1994)[, after remand, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000)].’ Ex parte Burgess, 811 So.2d 617 (Ala.2000).” McGriff v. State, 908 So.2d 961, 1006 (Ala.Crim.App.2000), reversed on other grounds, Ex parte McGriff, 908 So.2d 1024 (Ala.2004). See also Alabama Code 1975, § 13A-5-51, Commentary.

. Ten members of the jury in Ex parte Burgess, supra, also recommended life imprisonment without parole.

. In Ex parte Carroll, 852 So.2d at 835, the trial court stated that the jury did not have access to the pre-sentence report or to information concerning Carroll’s background, family, and work history; did not know that he had been incarcerated and recently released before obtaining the weapon used to kill the victim; and was not privy to the expressions of pain by the victim's family members.

.Carroll consistently admitted that he shot the victim but contended that he did not intend for the gun to fire and that the shooting was accidental.

. However, in Ex parte Burgess, 811 So.2d 617, 627 (Ala.2000), the Court discounted the following pertinent findings by the trial court in holding that it unduly considered the juvenile adjudications:
" ‘However, it is apparent from the facts in this case that the defendant was the individual who selected the victim and who was the one responsible for escalating the car theft into a homicide. It would appear from the evidence that it was the other boys' participation which was relatively minor by comparison to the defendant's. The fact that the other accomplices to this offense have not been made accountable for their participation is unfortunate, but does not in any way relieve the defendant of his culpability for this act.’ ”

. At trial, he stated that the disciplinary report indicated only that Investigator Pelham had been reprimanded for failing to maintain proper custody of certain police-issued equipment, including his vehicle and badge. (R. 1234.)

. This rule of law does not address the use of a prior criminal conviction for purposes of impeachment.

. The record indicates that McMillan’s motion to continue was made 14 days before the date set for trial. (C.R. 153, 423-24.)

. Two disposable cameras were found but the photographs at issue apparently all came from the same camera.

. There apparently were four photographs admitted of the same gun. One shows McMillan pointing the gun at the camera; one shows the gun on a pile of money; one shows the gun on what appears to be a pillow or bedding; and one shows the gun against a grey background.

. Because no statements are included in this evidence, prong (7) is inapplicable. Moreover, prong (6) would not apply to the photographs of the gun.

. A witness who was unable to identify anyone as the perpetrator testified that the man who shot the victim had long hair that showed under his hat and that he had facial hair "like a goatee.” (R.759-60, 764.)

. Three potential jurors, Numbers 103, 204, and 219 were struck for cause because of their inability to be impartial; however this impartiality was not attributed to pretrial publicity. Seven other potential jurors were removed for cause for specified reasons.

. McMillan's motion refers to forensic evidence from the truck rather than items removed from the truck.

. There were 60 fingerprints taken from the truck itself, as well as the items contained in the truck: 25 were unidentified; 3 belonged to the victim; and 33 belonged to McMillan.

.The expert also appears to have testified that no fingerprints were found to match either Melvin Eugene Browning or Melvin Ingram Browning. However, he also testified that he never received latent prints for either name. (R. 1321-22.)

. The record is unclear as to whether the unidentified prints were kept for further testing. Although statements were made concerning the fact that all the State’s evidence was available to the defense, the trial court stated that any evidence found to have any value had been retained for the defense.

. The Court also factually distinguished Mills from Ex parte Cook, 624 So.2d 511 (Ala.1993), because the officer who had seized the evidence testified that he had collected, secured, and maintained custody of the evidence until he transported it to the Department of Forensic Sciences.

. Cpl. Vandiver was the second to arrive at the scene and also-gave chase of the driver of the truck. (R. 1118.)

. McMillan’s pretrial "Motion to Bar the Death Penalty Because the Alabama Capital Statute Does Not Reflect Constitutional Limits” did not raise this claim. (C. 59-61.) Nor did his other pretrial motions concerning the arbitrariness of the imposition of the death penalty. (C. 47-49, 50-55, 56-58, 529-34.)

. State’s Exhibit 70.